**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MIRIAM S. MARTINEZ, | ) | |
| individually and on behalf of the classes | ) | |
| defined herein, | ) | 08 C 3519 |
| | ) | |
| Plaintiff, | ) | Judge Pallmeyer |
| | ) | |
| vs. | ) | Magistrate Judge Mason |
| | ) | |
| RESURGENCE FINANCIAL, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S PRELIMINARY MOTION FOR CLASS CERTIFICATION

Plaintiff respectfully requests that this Court enter an order determining that this Fair Debt Collection Practices Act ("FDCPA") action may proceed as a class action against defendant Resurgence Financial, LLC ("Resurgence").

With respect to Count I of the Complaint, <u>Class A</u> consists of (a) all individuals (b) against whom defendant Resurgence Financial, LLC filed a collection lawsuit (c) in Illinois, Indiana or Wisconsin (d) on or after June 19, 2007, and on or before July 9, 2008, (e) alleging a Citibank credit card debt charged off prior to July 1, 2006 (f) that had attached to it any purported Citibank credit card agreement with a date of 2006 or later.

With respect to Count II of the Complaint, <u>Class B</u> consists of (a) all individuals (b) against whom defendant Resurgence Financial, LLC filed a collection lawsuit (c) in Illinois (d) on or after January 1, 2008, and on or before July 9, 2008, (e) alleging a Citibank credit card debt charged off prior to July 1, 2006 (f) that had attached to it any purported Citibank credit card agreement with a date of 2006 or later.

With respect to Count III of the Complaint, <u>Class C</u> consists of (a) all individuals (b) against whom defendant Resurgence Financial, LLC filed a collection lawsuit (c) in Illinois (d) on or after July 1, 2006, and on or before July 9, 2008, (e) alleging a Citibank credit card debt charged off prior to July 1, 2006 (f) that had attached to it any purported Citibank credit card

agreement with a date of 2006 or later.  (Counts IV and V are individual claims).

Plaintiff further requests that Edelman, Combs, Latturner & Goodwin, LLC be appointed counsel for the class.

In support of this motion, plaintiff states:

## NATURE OF THE CASE

1.    This case concerns a standard practice used by defendant Resurgence in filing falsified and fraudulent documents in collection lawsuits brought to collect purported debts which it claims to have purchased.

2.    On or about April 30, 2008, Resurgence filed suit against plaintiff Miriam S. Martinez in the Circuit Court of Cook County to collect a purported debt incurred for personal, family or household purposes.  Resurgence Financial, LLC claimed to have purchased the debt, a Citibank South Dakota Dividend credit card that was charged off on January 19, 2006, and which would have become delinquent 180 days previously, or in July 2005.

3.    The standard form complaint represented that "[a] copy of the Agreement containing the terms and conditions governing the use of the credit card is attached hereto, made a part hereof, and marked as Exhibit B."

4.    The complaint and exhibits are attached as <u>Appendix A</u>.

5.    Very close examination of the purported agreement reveals that it has revision dates of June 2006 and July 2006.

6.    The purported contract is unsigned.  Resurgence alleged in the complaint that it became binding on the cardholder because "[t]hereafter," following receipt of the document "Defendant incurred charges by use of the credit card."

7.    The purported agreement is identical to that attached to the Barrera and Felton complaints described below, even though (a) it is impossible that a document with a copyright date of 2006 and revision dates of June 2006 and July 2006 could govern a credit card which went into default in July 2005 and (b) Martinez, Barrera and Felton had different types of

2

Citibank credit cards.

8.    Because it paid so little for its "rights" that no genuine documentation was supplied, defendant Resurgence embarked upon a scheme to fraudulently pass off a false document as the agreement to which numerous debtors were parties.

9.    Plaintiff was damaged as a result, in that she was required to retain counsel who had to analyze and deal with fictitious and fraudulent documents.

10.    The filing of collection lawsuits is regularly picked up and reported by credit bureaus.

11.    Plaintiff complains that such practice violates the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692e, 1692e(2), and 1692e(10), the Illinois Collection Agency Act, 225 ILCS 425/9 (20) and (31), and the Illinois Consumer Fraud Act, 815 ILCS 505/2. Plaintiff alleges that the filing of falsified and fraudulent documents in collection lawsuits violates the FDCPA as constituting a "false, deceptive, or misleading representation or means in connection with the collection of any debt" (§1692e), a false representation of the debt (§1692e(2)), and the use of a "false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer" (§1692e(10)) 1692e(10). Plaintiff further contends that Resurgence violated 225 ILCS 425/9 (20) by "attempting or threatening to enforce a right or remedy without knowledge or reason to know that the right or remedy does not exist," and "[e]ngaging in dishonorable, unethical, or unprofessional conduct of a character likely to deceive, defraud, or harm the public." 225 ILCS 425/9 (31). Finally, plaintiff contends that the same conduct constitutes an unfair practice within the meaning of the Illinois Consumer Fraud Act, 815 ILCS 505/2.

## OTHER EXAMPLES OF PRACTICE

### Dionisia Barrera

12.    On or about May 1, 2008, Resurgence Financial, LLC filed suit against Dionisia Barrera in the Circuit Court of Cook County to collect a purported debt incurred for personal, family or household purposes. Resurgence Financial, LLC claimed to have purchased the

debt, a Citibank South Dakota Classic credit card that was charged off on June 7, 2006 and which would have become delinquent 180 days previously, or in December 2005.

13.     The standard form complaint represented that "[a] copy of the Agreement containing the terms and conditions governing the use of the credit card is attached hereto, made a part hereof, and marked as Exhibit B."

14.     The complaint and exhibits are attached as Appendix B.

15.     Very close examination of the purported agreement reveals that it has revision dates of June 2006 and July 2006.

16.     The purported contract is unsigned.  Resurgence alleged in its complaint that it became binding on the cardholder because "[t]hereafter," following receipt of the document "Defendant incurred charges by use of the credit card."

17.     Based on the alleged charge-off and delinquency dates, no document sent later than December 2005 could possibly govern the consumer's relationship.

18.     The purported agreement is identical to that attached to the Martinez complaint, even though (a) it is impossible that a document with a copyright date of 2006 and revision dates of June 2006 and July 2006 could govern a credit card which went into default in December 2005 and (b) Barrera had a different type of credit card than Martinez.

**Cheyenne Felton**

19.     On or about May 3, 2008, Resurgence Financial, LLC filed suit against Cheyenne Felton in the Circuit Court of Cook County to collect a purported debt incurred for personal, family or household purposes.  Resurgence Financial, LLC claimed to have purchased the debt, a Citibank South Dakota Citidiamond Preferred credit card that was charged off on June 15, 2006 and which would have become delinquent 180 days previously, or in December 2005.

20.     The standard form complaint represented that "[a] copy of the Agreement containing the terms and conditions governing the use of the credit card is attached hereto, made

4

a part hereof, and marked as Exhibit B."

21.     The complaint and exhibits are attached as <u>Appendix C</u>.

22.     Very close examination of the purported agreement reveals that it has revision dates of June 2006 and July 2006.

23.     The purported contract is unsigned.  Resurgence alleged in the complaint that it became binding on the cardholder because "[t]hereafter," following receipt of the document "Defendant incurred charges by use of the credit card."

24.     The purported agreement is identical to that attached to the Martinez and Barrera complaints, even though (a) it is impossible that a document with a copyright date of 2006 and revision dates of June 2006 and July 2006 could govern a credit card which went into default in December 2005 and (b) Felton had a different type of credit card than Martinez and Barrera.

## CLASS CERTIFICATION REQUIREMENTS

25.     All requirements of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure have been met.

26.     With respect to all three Classes, it is reasonable to infer from the following facts that the number of class members exceeds the approximately 40 required for certification:

        a.     This action complains of a standard practice used by defendant;

        b.     <u>Appendices A-C</u> represent standard form complaints;

        c.     The purported agreement attached as <u>Exhibit B</u> to <u>Appendices A-C</u> are identical and represent form contracts frequently used by defendant in filing collection lawsuits irrespective of the identity or individual circumstances of the debtor;

        d.     Just this year, defendant Resurgence Financial, LLC filed more than 1,000 cases in Illinois alone.  (<u>Appendix D</u>; only the beginning and ends of each list have been filed to avoid unnecessary bulk).

27.     Plaintiff will obtain the exact number of class members through discovery,

and requests a briefing schedule long enough to obtain such information.

28.     With respect to all three Classes, there are questions of law and fact common to the class, which questions predominate over any questions affecting only individual class members. The primary question is whether defendant's practice violates the FDCPA.

29.     With respect to all three Classes, plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

30.     With respect to all three Classes, plaintiff will fairly and adequately represent the interests of the class members. Plaintiff has retained counsel experienced in consumer credit and debt collection abuse cases. (Appendix E).

31.     With respect to all three Classes, class action is superior to other alternative methods of adjudicating this dispute, in that:

a.     Congress specifically contemplated FDCPA class actions as a principal means of enforcing the statute;

b.     A class action is necessary to determine that defendant's conduct is a violation of law and bring about its cessation.

32.     In further support of this motion, plaintiff submits the accompanying memorandum of law.

33.     Plaintiff is filing a class certification motion at this time because of the decision in White v. Humana Health Plan, Inc., 06 C 5546, 2007 U.S. Dist. LEXIS 32263 (N.D. Ill., May 2, 2007).

WHEREFORE, plaintiff respectfully requests that this Court enter an order determining that this action may proceed as a class action.

Respectfully submitted,

s/ Daniel A. Edelman
Daniel A. Edelman

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Cassandra P. Miller
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, Suite 1800
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)

## <u>CERTIFICATE OF SERVICE</u>

I, Daniel A. Edelman, hereby certify that on June 25, 2008, the foregoing document was filed electronically using the Court's CM/ECF system.  A copy of the foregoing document was served on the following party via hand delivery:

RESURGENCE FINANCIAL, LLC
c/o Nathan M. Grossman, Registered Agent
20 S. Clark Street, Suite 1650
Chicago, IL 60603

I further certify that on the same date, a copy of the foregoing was also served on the following party via U.S. Mail:

Todd Lansky
Resurgence Financial, LLC
4100 Commercial Avenue
Northbrook, IL  60062

<u>s/ Daniel A. Edelman</u>
Daniel A. Edelman

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Cassandra P. Miller
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, Suite 1800
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)

# APPENDIX A

R0060494

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
FIRST MUNICIPAL DISTRICT

RESURGENCE FINANCIAL, LLC, an Illinois )
Limited Liability Company )
) 08M1    135403
Plaintiff )
) Amount Claimed: $4,375.41
)
v. ) Return Date:
)
MIRIAM S MARTINEZ ) JUN  9 2008
Defendant(s). )
)
)
)
)

### VERIFIED COMPLAINT AT LAW

RESURGENCE FINANCIAL, LLC, an Illinois Limited Liability Company ("Plaintiff"), by and through one of

its staff attorneys, complains of MIRIAM S MARTINEZ ("Defendant"), as follows:

1.    Pursuant to 735 ILCS 5/2-403, Plaintiff is proceeding in this cause as the Assignee of CITIBANK SOUTH

DAKOTA NA / DIVIDEND ("CITIBANK SOUTH DAKOTA NA / DIVIDEND"), as set forth in the Bill of Sale

attached hereto, made a part hereof and marked as Exhibit "A".

2.    CITIBANK SOUTH DAKOTA NA / DIVIDEND and Defendant entered into a Cardmember Agreement

("Agreement"), wherein CITIBANK SOUTH DAKOTA NA / DIVIDEND issued a credit card account number

▓▓▓▓▓▓▓▓▓6516 to Defendant and Defendant agreed to pay all amounts charged by the use if the card. A copy of the

Agreement containing the terms and conditions governing the use of the credit card is attached hereto, made a part here

of and marked as Exhibit "B".

3.    Defendant resides in the State of Illinois.

4.    Thereafter, Defendant incurred charges by use of the credit card.

5.    As set forth in the Affidavit of Plaintiff, attached hereto, made a part hereof and marked as Exhibit "C", there

is now due and owing from Defendant to Plaintiff the sum of $4,375.41, of which no part has been paid, although duly

demanded.

WHEREFORE, Plaintiff, Resurgence Financial, LLC, an Illinois Limited Liability Company, demands a judgment against the Defendant(s) MIRIAM S MARTINEZ, in the sum of $4,375.41, plus court costs.

Respectfully Submitted,

RESURGENCE FINANCIAL, LLC,
an Illinois Limited Liability Company,
Plaintiff herein,

By One of Its Staff Attorneys

VERIFICATION          ARAVIND RAGHU. ESQ.

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information an belief, and as to such matters the undersigned certifies as aforesaid that s/he verily believes the same to be true.

RESURGENCE FINANCIAL, LLC
By One of Its Attorneys

ARAVIND RAGHU. ESQ.

RESURGENCE FINANCIAL, LLC
Legal Department
4100 Commercial Avenue
Northbrook, IL 60062
847/656-2200
Firm No. 41776

EXHIBIT "A"

## BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT is dated as of November 29, 2007, between Citibank (South Dakota), N.A., a national banking association organized under the laws of the United States, located at 701 East 60th Street North, Sioux Falls, SD 57117 (the "Bank") and Unifund Portfolio A, LLC ("Buyer"), with its headquarters/principal place of business at 10625 Techwoods Circle, Cincinnati, OH 45242.

For value received and subject to the terms and conditions of the Purchase and Sale Agreement dated November 29, 2007, between Buyer and the Bank (the "Agreement"), the Bank does hereby transfer, sell, assign, convey, grant, bargain, set over and deliver to Buyer, and to Buyer's successors and assigns, all of the Bank's right, title and interest in and to the Accounts described in Section 1.2 of the Agreement.

Except as provided for in the Agreement, this Bill of Sale, Assignment and Assumption Agreement is executed without recourse and without representations or warranties including, without limitation, warranties as to collectibility.

Citibank (South Dakota), N.A.

By: _____
         (Signature)

Name:  Douglas C. Morrison

Title:  Vice President & CFO

Unifund Portfolio A, LLC

By: _____
         (Signature)

Name: Henry N. Thomas

Title: Vice President



Unifund CCR Partners

BILL OF SALE

Unifund CCR Partners, for value received and in accordance with the terms of the Accounts Receivable Purchase Agreement by and among Unifund CCR Partners and Resurgence Financial, LLC ("Purchaser"), dated as of March 4th, 2008 (the "Agreement"), does hereby sell, assign, and transfer to Purchaser all of its good and marketable title, free and clean of all liens, claims and encumbrances in and to the Accounts listed in the Account Schedule attached as Appendix A to the Agreement, without recourse and without representation or warranty of collectibility, or otherwise, except to the extent stated in the Agreement.

Executed on March 4th, 2008.


UNIFUND CCR PARTNERS


By
Joel Rosenthal
Director, Sales and Marketing

23

**AFFIDAVIT**

I, Joel Rosenthal, as Director of Sales and Marketing, for the Unifund Group, being duly sworn, deposes, and says:

1. Unifund CCR Partners is a New York General Partnership, and is the operating company for the Unifund Group.

2. Unifund Portfolio A, LLC is an Ohio limited liability company.

3. Unifund CCR Partners and Unifund Portfolio A, LLC share 100% common ownership.

4. Unifund Portfolio A, LLC purchased various portfolios of accounts from multiple sellers.

5. In accordance with a Servicing Agreement between Unifund CCR Partners and Unifund Portfolio A, LLC dated July 6, 2001; Unifund CCR Partners has the right and authority to sell accounts on behalf of Unifund Portfolio A, LLC.

6. Pursuant to such right and authority, Unifund CCR Partners sold a portfolio of 1897 accounts to Resurgence Financial, LLC via a Purchase Agreement and Bill of Sale dated March 10, 2008, on behalf of Unifund Portfolio A, LLC.

Further Affiant Sayeth Not.

Joel Rosenthal
Director of Sales and Marketing
Unifund CCR Partners

I do certify that the above sworn statement was duly taken and subscribed in my presence, this 17th day of March, 2007.

Notary Public

JENNIFER A DUNCAN
NOTARY PUBLIC
STATE OF OHIO
Comm. Expires
July 04, 2012

NOTARIAL SEAL
STATE OF OHIO

EXHIBIT "B"

# CARD AGREEMENT

This Card Agreement, which includes your card carrier, is your contract with us and governs the use of your card and account. The card carrier contains important account information, including your annual percentage rates and the amount of any membership fee. Please read and keep these documents for your records.

## FACTS ABOUT RATES AND FEES

For complete information about these facts, please see the related sections in this Card Agreement.

### RATES—FINANCE CHARGES

**Purchase and Cash Advance APRs:** See card carrier. All APRs based on the Prime Rate may vary each billing period.

**Default APR:** See card carrier. The Default APR equals the Prime Rate plus up to 23.99%, or up to 28.99%, whichever is greater. All APRs may automatically increase up to the Default APR if you fail to make a payment to us when due, exceed your credit line, or make a payment to us that is not honored.

**Minimum Finance Charge:** $0.50.

### TRANSACTION FEES—FINANCE CHARGES

**Balance Transfer Fee:** 3% of each balance transfer, $5 minimum, $75 maximum.

**Purchases Made in a Foreign Currency Fee:** 3% of each purchase after its conversion into U.S. dollars.

**Cash Advance Fee:** 3% of each cash advance, $5 minimum.

### OTHER FEES

**Late Fee:** $15 on balances up to $100; $29 on balances of $100 up to $250; $39 on balances of $250 and over.

**Over-the-Credit-Line Fee:** $39.

**Annual Membership Fee:** See card carrier.

**Returned Payment Fee:** $39.

**Returned Convenience Check Fee:** $39.

**Stop Payment on Convenience Check Fee:** $39.

**Rates, fees, and terms may change:** We may change the rates, fees, and terms of your account at any time for any reason. These reasons may be based on information in your credit report, such as your failure to make payments to another creditor when due, amounts owed to other creditors, the number of credit accounts outstanding, or the number of credit inquiries. These reasons may also include competitive or market-related factors. If we make a change for any of these reasons, you will receive advance notice and a right to opt out in accordance with applicable law.

## Definitions

*account:* the relationship established between you and us by this Card Agreement.

*APR:* annual percentage rate.

*authorized user:* any person you allow to use your account.

*card:* one or more cards or other account access devices, including account numbers, that we issue to you to obtain credit under this Card Agreement.

*Card Agreement (or Agreement):* this document and the card carrier.

*we, us, and our:* Citibank (South Dakota), N.A., the issuer of your account.

*you, your, and yours:* the person who applied to open the account and any other person responsible for complying with this Agreement, including the person to whom we address billing statements.

## Your Account

You agree to use your account in accordance with this Agreement. This Agreement is binding on you unless you cancel your account within 30 days after receiving the card, and you have not used or authorized use of the card. You must pay us for all amounts due on your account as specified in this Agreement. Your account must only be used for lawful transactions.

**Authorized Users:** You may allow authorized users to use your account. You may request additional cards for authorized users. You must pay us for all charges made by authorized users even if you did not intend to be responsible for those charges. You must notify us to revoke any permission you give to an authorized user to use a card or to use your account.

**Credit Line:** Your initial credit line appears on the card carrier. The full amount of your credit line is available to buy or lease goods or services where the card is honored. Part of your credit line, called the cash advance limit, is available for cash advances. We may change your credit line or cash advance limit at any time for any reason. We will notify you of any change, but the change may take effect before you receive the notice. The total balance on your account, including periodic finance charges and fees, must always remain below the credit line. However, if the total balance exceeds your credit line you must still pay us. If your account has a credit balance, we may reduce the credit balance by any new charges on your account. You may not maintain a credit balance in excess of your credit line.

**Billing Statement:** Your billing statement shows the total balance, periodic finance charges, fees, minimum amount due, and payment due date. It also shows your current credit line and cash advance limit; an itemized list of current charges, payments and credits; a rate summary; and other important information. We deliver a statement to only one address. You must notify Customer Service of a change in address. If we deem your account uncollectible or institute collection proceedings by sending it to an outside agency or attorney for collection, we may stop sending you statements. Periodic finance charges and fees continue to accrue even if we stop sending statements.

The total amount you owe us appears as the New Balance on the billing statement. To determine the New Balance we begin with the total balance at the start of the billing period. We add any purchases and cash advances and subtract any credits or payments credited as of that billing period. We then add any periodic finance charges or fees and make other adjustments.

## APRs

**APRs Based on Prime:** We calculate any APR based on the U.S. Prime Rate ("Prime Rate") by adding the applicable amount that appears on the card carrier to the Prime Rate. For each billing period we use the Prime Rate published in *The Wall Street Journal* two business days prior to the Statement/Closing Date for that billing period. If *The Wall Street Journal* does not publish the Prime Rate, we may substitute a similar published rate. A change in an APR due to a change in the Prime Rate takes effect as of the first day of the billing period for which we calculate the APR. We apply the new applicable APR to any existing balances, subject to any promotional rate that may apply.

**Default Rate:** All your APRs may increase if you default under any Card Agreement that you have with us because you fail to make a payment to us when due, you exceed your credit line, or you make a payment to us that is not honored. In these circumstances, we may automatically increase your APRs (including any promotional APRs) on all balances to the Default APR, which equals the Prime Rate plus up to 23.99%, or up to 28.99%, whichever is greater. Factors considered in determining your Default APR may include how long your account has been open, the timing or seriousness of a default under any Card Agreement that you have with us, or other indications of account performance. The Default APR takes effect as of the first day of the billing period in which you default. We may lower the APR for new purchases and/or cash advances if you meet the terms of all Card Agreements that you have with us for six consecutive billing periods. Existing balances remain subject to the Default APR until paid in full, unless we tell you otherwise.

2

3

**Effect of APR Increases:** If an APR increases, periodic finance charges increase and your minimum payment may increase.

## Periodic Finance Charges Based On APRs

**Periodic Finance Charges:** Periodic finance charges are finance charges that are added to your account when we apply the applicable APR to the balances on your account. We calculate periodic finance charges separately for each balance subject to different terms; for example, standard purchases, standard cash advances, and each promotional offer. The total periodic finance charge for the billing period equals the daily periodic finance charges for each balance for each day in the billing period. This method of calculating periodic finance charges results in daily compounding of finance charges.

**When Periodic Finance Charges Begin to Accrue:** Periodic finance charges begin to accrue on a charge from the date it is added to the daily balance and continue to accrue until payment in full is credited to your account. (Charges include purchases, balance transfers, cash advances, transaction fees, other fees, and any minimum finance charge.) You can avoid periodic finance charges on purchases (excluding balance transfers) that appear on your current billing statement if you paid the New Balance on the last statement by the payment due date on that statement and you pay your New Balance by the payment due date on your current statement. If you made a balance transfer, you may be unable to avoid periodic finance charges on new purchases, as described in the balance transfer offer.

**Calculation of Periodic Finance Charges:**
- For each balance, we multiply the daily balance by the applicable daily periodic rate. We do this for each day in the billing period. A daily periodic rate is the applicable APR divided by 365. A billing period begins on the day after the Statement/Closing Date of the previous billing period and includes the Statement/Closing Date of the current billing period.

- To get the daily balance, we take the beginning balance for each balance every day (including unpaid periodic finance charges from previous billing periods), add any new charges; and any periodic finance charge on the previous day's balance, subtract any credits or payments credited as of that day, and make other adjustments. A credit balance is treated as a balance of zero.

- We add a charge to the daily balance as follows: We add a purchase to the appropriate balance as of the Sale Date on the billing statement. We add a balance transfer or cash advance to the appropriate balance as of the Post Date on the statement. We add any transaction fees for purchases,

balance transfers, or cash advances to the same balance as the transaction as of the same date the transaction is added to the daily balance. The Post Date is the date we receive your request for the balance transfer or cash advance, including a request that we complete a balance transfer or cash advance convenience check for a specific amount. If you send a balance transfer or convenience check directly to someone, the Post Date is the date we receive the check for payment.

- To get the total periodic finance charge, we add up all of the daily periodic finance charges for each balance for each day in the billing period.

- For each balance, the Balance Subject to Finance Charge on the statement is the average of the daily balances during the billing period. If you multiply this figure for each balance by the number of days in the billing period and by the applicable daily periodic rate, the result is the periodic finance charges assessed for that balance, except for minor variations caused by rounding.

**Minimum Finance Charge:** If the periodic rate finance charge would otherwise be less than $0.50, we assess a minimum FINANCE CHARGE of $0.50. We add the amount to any balance that is assessed a finance charge.

## Transaction Fees

**Transaction Fees and APRs:** If you are assessed a transaction fee for a balance transfer, a purchase made in a foreign currency, or a cash advance, the transaction fee will cause the APR on the billing statement on which the transaction first appears to exceed your nominal APR.

**Transaction Fee for Balance Transfers:** You obtain a balance transfer if you obtain funds through a balance transfer check or transfer a balance without using a cash advance convenience check. We treat balance transfers as purchases unless otherwise provided in this Agreement. For each balance transfer we add an additional FINANCE CHARGE of 3% of the amount of the balance transfer, but not less than $5 or more than $75.

**Transaction Fee for Purchases Made in a Foreign Currency:** For each purchase made in a foreign currency we add an additional FINANCE CHARGE of 3% of the purchase amount after its conversion into U.S. dollars.

**Transaction Fee for Cash Advances:** You obtain a cash advance if you obtain funds through an automated teller machine (ATM), convenience check, home banking, or financial institution; make a wire transfer; obtain a money order, traveler's check, lottery ticket, casino chip, or similar item; or engage in a similar transaction. For each cash

advance we add an additional **FINANCE CHARGE** of 3% of the amount of the cash advance, but not less than $5.

### Other Fees

**Late Fee:** We add a late fee to the standard purchase balance for each billing period you fail to pay, by its due date, the Minimum Amount Due (less the Amount Over Credit Line shown on your billing statement). This fee is based on your account balance as of the payment due date. It is: $15 on balances up to $100, $29 on balances of $100 up to $250, and $39 on balances of $250 and over.

**Over-the-Credit-Line Fee:** We add a $39 fee to the standard purchase balance if your account balance exceeds your credit line at any time during the billing period. We add this fee even if transactions we authorize or periodic finance charges, fees, and other charges you incur are a reason the account balance exceeds your credit line. We add this fee even if the account balance falls below your credit line by the end of the billing period.

**Annual Membership Fee:** We add any applicable annual membership fee to the standard purchase balance. This fee is non-refundable unless you notify us to cancel your account within 30 days of the mailing or delivery date of the billing statement on which the fee is billed.

**Returned Payment Fee:** We add a $39 fee to the standard purchase balance if a payment check or similar instrument is not honored or is returned because it cannot be processed, or if an automatic debit is returned unpaid. We assess this fee the first time your check or payment is not honored, even if it is honored upon resubmission.

**Returned Convenience Check Fee:** We add a $39 fee to the standard advance balance if we decline to honor a convenience check. We may decline to honor these checks if, for example, the amount of the check would cause the balance to exceed the cash advance limit or credit line, if you default, if you did not comply with our instructions regarding the check, or if your account has been closed.

**Stop Payment on Convenience Check Fee:** We add a $39 fee to the standard advance balance if we honor your request to stop payment on a convenience check. To stop payment on a convenience check write us at P.O. Box 6500, Sioux Falls, South Dakota 57117, or call the Customer Service number on the billing statement. If you call, you must confirm the call in writing within 14 days. A written stop payment order remains in effect for 6 months unless renewed in writing.

**Balance Transfer Checks and Convenience Checks:** Each check must be in the form it was issued and used according to any instructions we give. The checks must not be used to pay an amount owed us under this or another Card Agreement that you have with us. We do not certify these checks or return any such checks that have been paid.

### Information on Foreign Currency Conversion Procedures

If you make a transaction in a foreign currency, other than a cash advance made at a branch or ATM of one of our affiliates, MasterCard, Visa or American Express, depending on which card is used, converts the amount into U.S. dollars as follows:

- MasterCard complies with its foreign currency conversion procedures then in effect. MasterCard currently uses a conversion rate in effect one day prior to its transaction processing date. Such rate is either a wholesale market rate or the government-mandated rate.
- Visa complies with its foreign currency conversion procedures then in effect. Visa currently uses a conversion rate in effect on its applicable central processing date. Such rate is either a rate it selects from the range of rates available in wholesale currency markets, which may vary from the rate it receives, or the government-mandated rate.
- American Express complies with its foreign currency conversion procedures then in effect. Unless a particular rate is required by applicable law, the rate used by American Express shall be the highest interbank rate selected on the business day prior to the day on which the transaction is processed by American Express.

If a cash advance is made in a foreign currency at a branch or ATM of one of our affiliates, the amount is converted into U.S. dollars by our affiliate in accordance with its foreign currency conversion procedures then in effect. Our affiliate currently uses a conversion rate in effect on its applicable processing date. Such rate is either a mid-point market rate or the government-mandated rate.

The foreign currency conversion rate in effect on the applicable processing date for a transaction may differ from the rate in effect on the Sale or Post date on your billing statement for that transaction.

If a transaction is converted by a third party prior to such transaction being processed by MasterCard, Visa, or American Express, the foreign currency conversion rate for that transaction will be the rate selected by that third party.

### Payments

**Minimum Amount Due:** Each month you must pay at least the Minimum Amount Due by the payment due date. The

6

7

sooner you pay the New Balance, the less you will pay in periodic finance charges.

To calculate the Minimum Amount Due, we begin with any past due amount and add any amount in excess of your credit line. We then add the largest of the following:

- The New Balance on the billing statement if it is less than $20;
- $20 if the New Balance is at least $20;
- 1% of the New Balance (which calculation is rounded down to the nearest dollar) plus the amount of your billed finance charges and any applicable late fee; or
- 1.5% of the New Balance (which calculation is rounded down to the nearest dollar).

However, the Minimum Amount Due never exceeds the New Balance. In calculating the Minimum Amount Due, we may subtract from the New Balance certain fees added to your account during the billing period.

**Application of Payments:** We apply payments and credits to low APR balances before higher APR balances. That means your savings will be reduced if you make transactions that are subject to higher APRs.

**Payment Instructions:** Payments are credited in accordance with the payment instructions on the billing statement. You must pay us in U.S. dollars using a check, similar instrument, or automatic debit that is drawn on and honored by a bank in the U.S. Do not send cash. We can accept late or partial payments, and payments that reflect "paid in full" or other restrictive endorsements, without losing our rights. We reserve the right to accept payments made in foreign currency and instruments drawn on funds on deposit outside the U.S. If we do, we select the currency conversion rate at our discretion and credit your account in U.S. dollars after deducting any costs incurred in processing your payment, or we may bill you separately for such costs.

**Optional Pay by Phone Service:** You may request to make your payment by phone using our optional Pay by Phone Service. Each time you make such a request, you agree to pay us the amount shown in the Pay by Phone section on the back of the billing statement. Our representatives are trained to tell you this amount if you decide to use this optional Pay by Phone Service.

## Credit Reporting

We may report information about your account to credit reporting agencies. Late payments, missed payments, or other defaults on your account may appear on your credit report. If you request cards on your account for others, we may report account information in the names of those other people as well. We may also obtain follow-up credit reports on you (for example, when we review your account for a credit line increase). If you wish to know which agencies we contacted, write us at the Customer Service address on the billing statement.

If you think we reported erroneous information to a credit reporting agency, write us at the Customer Service address on the billing statement. We will promptly investigate the matter and if we agree with you, we will contact each credit reporting agency to which we reported and request a correction. If, after our investigation, we disagree with you, we will tell you in writing or by telephone and tell you how to submit a statement to those agencies for inclusion in your credit report.

## Changes to this Agreement

We may change the rates, fees, and terms of this Agreement at any time for any reason. These reasons may be based on information in your credit report, such as your failure to make payments to another creditor when due, amounts owed to other creditors, the number of credit accounts outstanding, or the number of credit inquiries. These reasons may also include competitive or market-related factors. Changing terms includes adding, replacing, or deleting provisions relating to your account and to the nature, extent, and enforcement of the rights and obligations you or we have relating to this Agreement. These changes are binding on you. However, if the change will cause a fee, rate or minimum payment to increase, we will mail you written notice at least 15 days before the beginning of the billing period in which the change becomes effective. If you do not agree to the change, you must notify us in writing within 25 days after the effective date of the change and pay us the total balance, either at once or under the terms of the unchanged Agreement. Unless we notify you otherwise, use of the card after the effective date of the change shall be deemed acceptance of the new terms, even if the 25 days have not expired.

## Default

You default under this Agreement if you fail to pay the Minimum Amount Due by its due date; exceed your credit line; pay by a check or similar instrument that is not honored or that we must return because it cannot be processed; pay by automatic debit that is returned unpaid; file for bankruptcy; or default under any other Card Agreement that you have with us. If you default, we may close your account and demand immediate payment of the total balance. If you gave us a security interest in a Certificate of Deposit, we may use the deposit amount to pay any amount you owe.

## Refusal of the Card, Closed Accounts, and Related Provisions

**Refusal of the Card:** We do not guarantee approval of transactions and are not liable for transactions that are not approved, either by us or by a third party, even if you have sufficient credit available. We may limit the number of transactions that may be approved in one day. If we detect unusual or suspicious activity, we may suspend your credit privileges until we can verify the activity.

**Preauthorized Charges:** If you default, if the card is lost or stolen, or we change your account for any reason, we may suspend automatic charges with third party vendors. If preauthorized charges are suspended, you are responsible for making direct payment for such charges until you contact the third party to reinstate the automatic charges.

**Lost or Stolen Cards, Account Numbers, or Convenience and Balance Transfer Checks:** If any card, account number, or check is lost or stolen or if you think someone used or may use them without permission, call us at the Customer Service number on the billing statement or the number obtained by calling toll-free or local Directory Assistance. We may require you to provide certain information in writing to help us find out what happened and to comply with our investigation. You must identify for us the charges that were not made by you, or someone authorized by you, and from which you received no benefit.

**Closing Your Account:** You may close your account by notifying us in writing or by calling toll-free at the Customer Service number shown on the billing statement or on the back of your credit card, but must still repay the total balance in accordance with this Agreement. We may close your account or suspend account privileges at any time for any reason without prior notice. We may also reissue a different card at any time. You must return any card to us upon request.

**Security Interest for Secured Accounts:** If your account is a secured account, you gave us a security interest in a Certificate of Deposit to secure repayment of your account. If you withdraw your funds from the Certificate of Deposit, we will close your account.

## ARBITRATION

*PLEASE READ THIS PROVISION OF THE AGREEMENT CAREFULLY.* IT PROVIDES THAT ANY DISPUTE MAY BE RESOLVED BY BINDING ARBITRATION. ARBITRATION REPLACES THE RIGHT TO GO TO COURT, INCLUDING THE RIGHT TO A JURY AND THE RIGHT TO PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING. IN ARBITRATION,

10

A DISPUTE IS RESOLVED BY AN ARBITRATOR INSTEAD OF A JUDGE OR JURY. ARBITRATION PROCEDURES ARE SIMPLER AND MORE LIMITED THAN COURT PROCEDURES.

*Agreement to Arbitrate:* Either you or we may, without the other's consent, elect mandatory, binding arbitration for any claim, dispute, or controversy between you and us (called "Claims").

### Claims Covered

**What Claims are subject to arbitration?** All Claims relating to your account, a prior related account, or our relationship are subject to arbitration, including Claims regarding the application, enforceability, or interpretation of this Agreement and this arbitration provision. All Claims are subject to arbitration, no matter what legal theory they are based on or what remedy (damages, or injunctive or declaratory relief) they seek. This includes Claims based on contract, tort (including intentional tort), fraud, agency, your or our negligence, statutory or regulatory provisions, or any other sources of law; Claims made as counterclaims, cross-claims, third-party claims, interpleaders or otherwise; and Claims made independently or with other claims. A party who initiates a proceeding in court may elect arbitration with respect to any Claim advanced in that proceeding by any other party. Claims and remedies sought as part of a class action, private attorney general or other representative action are subject to arbitration on an individual (non-class, non-representative) basis, and the arbitrator may award relief only on an individual (non-class, non-representative) basis.

**Whose Claims are subject to arbitration?** Not only ours and yours, but also Claims made by or against anyone connected with us or you or claiming through us or you; such as a co-applicant or authorized user of your account, an employee, agent, representative, affiliated company, predecessor or successor, heir, assignee, or trustee in bankruptcy.

**What time frame applies to Claims subject to arbitration?** Claims arising in the past, present, or future, including Claims arising before the opening of your account, are subject to arbitration.

**Broadest Interpretation.** Any questions about whether Claims are subject to arbitration shall be resolved by interpreting this arbitration provision in the broadest way the law will allow it to be enforced. This arbitration provision is governed by the Federal Arbitration Act (the "FAA").

**What about Claims filed in Small Claims Court?** Claims filed in a small claims court are not subject to arbitration, so long as the matter remains in such court and advances only an individual (non-class, non-representative) Claim.

11

## How Arbitration Works

**How does a party initiate arbitration?** The party filing an arbitration must choose one of the following two arbitration firms and follow its rules and procedures for initiating and pursuing an arbitration: American Arbitration Association or National Arbitration Forum. Any arbitration hearing that you attend will be held at a place chosen by the arbitration firm in the same city as the U.S. District Court closest to your then current billing address, or at some other place to which you and we agree in writing. You may obtain copies of the current rules of each of the arbitration firms and forms and instructions for initiating an arbitration by contacting them as follows:

> American Arbitration Association
> 335 Madison Avenue, Floor 10
> New York, NY 10017-4805
> Web site: www.adr.org
> National Arbitration Forum
> P.O. Box 50191
> Minneapolis, MN 55405
> Web site: www.arbitration-forum.com

At any time you or we may ask an appropriate court to compel arbitration of Claims, or to stay the litigation of Claims pending arbitration, even if such Claims are part of a lawsuit, unless a trial has begun or a final judgment has been entered. Even if a party fails to exercise these rights at any particular time, or in connection with any particular Claims, that party can still require arbitration at a later time or in connection with any other Claims.

**What procedures and law are applicable in arbitration?** A single, neutral arbitrator will resolve Claims. The arbitrator will be either a lawyer with at least ten years experience or a retired or former judge, selected in accordance with the rules of the arbitration firm. The arbitration will follow procedures and rules of the arbitration firm in effect on the date the arbitration is filed unless those procedures and rules are inconsistent with this Agreement, in which case this Agreement will prevail. Those procedures and rules may limit the discovery available to you or us. The arbitrator will take reasonable steps to protect customer account information and other confidential information if requested to do so by you or us. The arbitrator will apply applicable substantive law consistent with the FAA and applicable statutes of limitations, will honor claims of privilege recognized at law, and will have the power to award to a party any damages or other relief provided for under applicable law. You or we may choose to have a hearing and be represented by counsel. The arbitrator will make any award in writing and, if requested by you or us,

will provide a brief statement of the reasons for the award. An award in arbitration shall determine the rights and obligations between the named parties only, and only in respect of the Claims in arbitration, and shall not have any bearing on the rights and obligations of any other person, or on the resolution of any other dispute.

**Who pays?** Whoever files the arbitration pays the initial filing fee. If we file, we pay; if you file, you pay, unless you get a fee waiver under the applicable rules of the arbitration firm. If you have paid the initial filing fee and you prevail, we will reimburse you for that fee. If there is a hearing, we will pay any fees of the arbitrator and arbitration firm for the first day of that hearing. All other fees will be allocated as provided by the rules of the arbitration firm and applicable law. However, we will advance or reimburse your fees if the arbitration firm or arbitrator determines there is good reason for requiring us to do so, or if you ask us and we determine there is good reason for doing so. Each party will bear the expense of that party's attorneys, experts, and witnesses, and other expenses, regardless of which party prevails, but a party may recover any or all expenses from another party if the arbitrator, applying applicable law, so determines.

**Who can be a party?** Claims must be brought in the name of an individual person or entity and must proceed on an individual (non-class, non-representative) basis. The arbitrator will not award relief for or against anyone who is not a party. If you or we require arbitration of a Claim, neither you, we, nor any other person may pursue the Claim in arbitration as a class action, private attorney general action or other representative action, nor may such Claim be pursued on your or our behalf in any litigation in any court. Claims, including assigned Claims, of two or more persons may not be joined or consolidated in the same arbitration. However, applicants, co-applicants, authorized users on a single account and/or related accounts, or corporate affiliates are here considered as one person.

**When is an arbitration award final?** The arbitrator's award is final and binding on the parties unless a party appeals it in writing to the arbitration firm within fifteen days of notice of the award. The appeal must request a new arbitration before a panel of three neutral arbitrators designated by the same arbitration firm. The panel will consider all factual and legal issues anew, follow the same rules that apply to a proceeding using a single arbitrator, and make decisions based on the vote of the majority. Costs will be allocated in the same way they are allocated for arbitration before a single arbitrator. An award by a panel is final and binding on the parties after fifteen days has passed. A final and binding award is subject

to judicial review and enforcement as provided by the FAA or other applicable law.

### Survival and Severability of Terms

This arbitration provision shall survive: (i) termination or changes in the Agreement, the account, or the relationship between you and us concerning the account; (ii) the bankruptcy of any party; and (iii) any transfer, sale or assignment of your account, or any amounts owed on your account, to any other person or entity. If any portion of this arbitration provision is deemed invalid or unenforceable, the entire arbitration provision shall not remain in force. No portion of this arbitration provision may be amended, severed or waived absent a written agreement between you and us.

### Applicable Law and Enforcing our Rights

**Applicable Law:** The terms and enforcement of this Agreement shall be governed by federal law and the law of South Dakota, where we are located.

**Enforcing this Agreement:** We can delay in enforcing or fail to enforce any of our rights under this Agreement without losing them.

**Collection Costs:** If we refer collection of your account to a lawyer who is not our salaried employee, you are liable for any reasonable attorney's fees we incur, plus the costs and expenses of any legal action, to the extent permitted by law.

**Assignment:** We may assign any or all of our rights and obligations under this Agreement to a third party.

### For Further Information

Call the toll-free Customer Service telephone number shown on the billing statement or on the back of your card. You can also call local or toll-free Directory Assistance to get our telephone number.

Ken Stork
President & CEO

Citibank (South Dakota), N.A.
P.O. Box 6000
Sioux Falls, SD 57117

© 2006 Citibank (South Dakota), N.A.

### What To Do If There's An Error In Your Bill

**Your Billing Rights. Keep This Notice For Future Use**

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

**Notify Us In Case of Errors or Questions About Your Bill.**

If you think your billing statement is wrong, or if you need more information about a transaction on your billing statement, write to us (on a separate sheet) as soon as possible at the address provided in the Billing Rights Summary portion on the back of your statement. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:

• Your name and account number.
• The dollar amount of the suspected error.
• Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.
• Please sign your letter.

If you authorized us to pay your credit card bill automatically from your savings or checking account, you can stop the payment on any amount you think is wrong. To stop the payment you must tell us at least three business days before the automatic payment is scheduled to occur.

**Your Rights and Our Responsibilities After We Receive Your Written Notice.**

We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we must either correct the error or explain why we believe your billing statement was correct. After we receive your letter, we cannot try to collect any amount you question, or report your account as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your credit line. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your balance that are not in question.

If we find that we made a mistake on your billing statement, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date it is due.

14

15

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within 10 days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And, we must tell you the name and address of anyone to whom we reported your account information. We must tell anyone we report you to that the matter has been settled between us when it is finally settled.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your billing statement was correct.

### Special Rule for Credit Card Purchases.

If you have a problem with the quality of property or services that you purchased with a credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the property or services. There are two limitations on this right:

- You must have made the purchase in your home state or, if not within your home state, within 100 miles of your current address; and
- The purchase price must have been more than $50.

These limitations do not apply if we own or operate the merchant, or if we mailed you the advertisement for the property or services.

© 2006 Citibank (South Dakota), N.A.

5049170U          Pr. 07/06    109060                                06/06

# EXHIBIT "C"

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
FIRST MUNICIPAL DISTRICT

RESURGENCE FINANCIAL, LLC, an Illinois Limited )
Liability Company                                )  Case No.
                                                 )
                                    Plaintiff    )
                                                 )  **08M1   135403**
         v.                                      )
   MIRIAM S MARTINEZ                              )
                                                 )
                                   Defendant(s). )
                                                 )
                                                 )
                                                 )

AFFIDAVIT OF CLAIM

I, Eileen M. Mahon, an employee of Resurgence Financial, LLC, being first duly sworn upon my oath depose and state as follows:

1.      I am over the age of 21, under no legal disability, and if called and sworn as a witness in this cause, would testify that I have personal knowledge of the facts set forth in this petition.

2.      I am employed by Resurgence Financial, LLC, an Illinois Limited Liability Company ("Resurgence").

3.      Resurgence is proceeding in this matter on an assignment from UNIFUND.

4.      I am familiar with the account of MIRIAM S MARTINEZ with Resurgence.

5.      I am familiar with the computer records of Resurgence and how to search the records of Resurgence to determine the status of accounts with our company.

6.      I have the authority to review the computer records of Resurgence.

7.      I have reviewed the records of Resurgence, which reflect that MIRIAM S MARTINEZ was issued a credit card by CITIBANK SOUTH DAKOTA NA / DIVIDEND, with an account number of ▓▓▓▓▓6516 and that the issuer, CITIBANK SOUTH DAKOTA NA / DIVIDEND charged off said account on January 19, 2006, as a result of Defendant defaulting in making payments pursuant to the Cardmember Agreement.

8.      I have reviewed the computer records of Resurgence.  There is a balance due to Resurgence on this account in the amount of $4,375.41 and Resurgence has not received payment.

FURTHER, THE AFFIANT SAYETH NAUGHT.

"OFFICIAL ____"
TRESSA I PECK
Notary Public, State of Illinois
My Commission Expires 11/4/2009

*Eileen M. Mahon*
RESURGENCE FINANCIAL, LLC
By its duly authorized agent

SUBSCRIBED AND SWORN TO
before me this 15th day of April, 2008.

EILEEN M. MAHON

NOTARY PUBLIC

R0060494

UNITED STATES OF AMERICA

STATE OF ILLINOIS

COUNTY OF COOK

FIRST MUNICIPAL DISTRICT

| | | |
|---|---|---|
| RESURGENCE FINANCIAL, LLC, an Illinois Limited Liability Company, | CASE NUMBER | |
| Plaintiff | | |
| v. | _____ | |
| MIRIAM S MARTINEZ | | FILE STAMP HERE |
| Defendant(s) | | |

## AFFIDAVIT TO MILITARY SERVICE

Resurgence Financial LLC, by its duly authorized agent, being first duly sworn upon my oath depose and states:

With respect to (each) defendant, MIRIAM S MARTINEZ, ███████████ ███████████:

☐    the Defendant is

☒    the Defendant is not

☐    I am unable to determine whether the Defendant is

in the military service of the United States of America.

This affidavit is based on these facts:  I searched on the Department of Defense website:  www.dmdc.osd.mil/scra/owa/home and the report indicated that the Defendant (is) (is not) on active military duty.

"OFFICIAL SEAL"
TRESSA I PECK
Notary Public, State of Illinois
My Commission Expires 11/4/2009

*Eileen M Mahon*

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the above signed certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on the information and belief and as to such matters the above signed certifies as aforesaid that s/he believes the same to be true.

Sworn and Subscribed before me
this 15th day of April, 2008

EILEEN M. MAHON

NOTARY PUBLIC

RESURGENCE FINANCIAL, LLC
Legal Department
4100 Commercial Avenue
Northbrook, IL 60062
847/656-2200
#41776

# APPENDIX B

R0060514

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
FIRST MUNICIPAL DISTRICT

RESURGENCE FINANCIAL, LLC, an Illinois )
Limited Liability Company )
)
)                Case No.
                    Plaintiff )        08M1 136266
)               Amount Claimed: $8,750.18
v. )
)               Return Date:   JUN 9 2008
)
DIONISIA BARRERA )
                Defendant(s). )
)
)
)
)
)



**VERIFIED COMPLAINT AT LAW**

RESURGENCE FINANCIAL, LLC, an Illinois Limited Liability Company ("Plaintiff"), by and through one of

its staff attorneys, complains of DIONISIA BARRERA ("Defendant"), as follows:

1.    Pursuant to 735 ILCS 5/2-403, Plaintiff is proceeding in this cause as the Assignee of CITIBANK SOUTH

DAKOTA NA / CLASSIC ("CITIBANK SOUTH DAKOTA NA / CLASSIC"), as set forth in the Bill of Sale attached

hereto, made a part hereof and marked as Exhibit "A".

2.     CITIBANK SOUTH DAKOTA NA  / CLASSIC and Defendant entered into a Cardmember Agreement

("Agreement"), wherein CITIBANK SOUTH DAKOTA NA  / CLASSIC issued a credit card account number

▓▓▓▓▓2504 to Defendant and Defendant agreed to pay all amounts charged by the use if the card.  A copy of the

Agreement containing the terms and conditions governing the use of the credit card is attached hereto, made a part here

of and marked as Exhibit "B".

3.    Defendant resides in the State of Illinois.

4.    Thereafter, Defendant incurred charges by use of the credit card.

5.    As set forth in the Affidavit of Plaintiff, attached hereto, made a part hereof and marked as Exhibit "C", there

is now due and owing from Defendant to Plaintiff the sum of $8,750.18, of which no part has been paid, although duly

demanded.

WHEREFORE, Plaintiff, Resurgence Financial, LLC, an Illinois Limited Liability Company, demands a judgment against the Defendant(s) DIONISIA BARRERA, in the sum of $8,750.18, plus court costs.

Respectfully Submitted,

RESURGENCE FINANCIAL, LLC,
an Illinois Limited Liability Company,
Plaintiff herein,

By One of Its Staff Attorneys

ARAVIND RAGHU, ESQ.

### VERIFICATION

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information an belief, and as to such matters the undersigned certifies as aforesaid that s/he verily believes the same to be true.

RESURGENCE FINANCIAL, LLC
By One of Its Attorneys

ARAVIND RAGHU, ESQ.

RESURGENCE FINANCIAL, LLC
Legal Department
4100 Commercial Avenue
Northbrook, IL 60062
847/656-2200
Firm No. 41776

# EXHIBIT "A"

## BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT is dated as of November 29, 2007, between Citibank (South Dakota), N.A., a national banking association organized under the laws of the United States, located at 701 East 60th Street North, Sioux Falls, SD 57117 (the "Bank") and Unifund Portfolio A, LLC ("Buyer"), with its headquarters/principal place of business at 10625 Techwoods Circle, Cincinnati, OH 45242.

For value received and subject to the terms and conditions of the Purchase and Sale Agreement dated November 29, 2007, between Buyer and the Bank (the "Agreement"), the Bank does hereby transfer, sell, assign, convey, grant, bargain, set over and deliver to Buyer, and to Buyer's successors and assigns, all of the Bank's right, title and interest in and to the Accounts described in Section 1.2 of the Agreement.

Except as provided for in the Agreement, this Bill of Sale, Assignment and Assumption Agreement is executed without recourse and without representations or warranties including, without limitation, warranties as to collectibility.

Citibank (South Dakota), N.A.

By: _____
            (Signature)

Name: Douglas C. Morrison

Title: Vice President & CFO

Unifund Portfolio A, LLC

By: _____
            (Signature)

Name: Henry N. Thoman

Title: Vice President



Unifund CCR Partners

BILL OF SALE

Unifund CCR Partners, for value received and in accordance with the terms of the Accounts Receivable Purchase Agreement by and among Unifund CCR Partners and Resurgence Financial, LLC ("Purchaser"), dated as of March 4th, 2008 (the "Agreement"), does hereby sell, assign, and transfer to Purchaser all of its good and marketable title, free and clean of all liens, claims and encumbrances in and to the Accounts listed in the Account Schedule attached as Appendix A to the Agreement, without recourse and without representation or warranty of collectibility, or otherwise, except to the extent stated in the Agreement.

Executed on March 4th, 2008.

UNIFUND CCR PARTNERS

By
Joel Rosenthal
Director, Sales and Marketing

23

## AFFIDAVIT

I, Joel Rosenthal, as Director of Sales and Marketing, for the Unifund Group, being duly sworn, deposes, and says:

1. Unifund CCR Partners is a New York General Partnership, and is the operating company for the Unifund Group.

2. Unifund Portfolio A, LLC is an Ohio limited liability company.

3. Unifund CCR Partners and Unifund Portfolio A, LLC share 100% common ownership.

4. Unifund Portfolio A, LLC purchased various portfolios of accounts from multiple sellers.

5. In accordance with a Servicing Agreement between Unifund CCR Partners and Unifund Portfolio A, LLC dated July 6, 2001; Unifund CCR Partners has the right and authority to sell accounts on behalf of Unifund Portfolio A, LLC.

6. Pursuant to such right and authority, Unifund CCR Partners sold a portfolio of 1897 accounts to Resurgence Financial, LLC via a Purchase Agreement and Bill of Sale dated March 19, 2008, on behalf of Unifund Portfolio A, LLC.

Further Affiant Sayeth Not.


Joel Rosenthal
Director of Sales and Marketing
Unifund CCR Partners


I do certify that the above sworn statement was duly taken and subscribed in my presence, this 17th day of _March_, 2007.


Notary Public

JENNIFER A DUNCAN
NOTARY PUBLIC
STATE OF OHIO
Comm. Expires
July 04, 2012

EXHIBIT "B"

# CARD AGREEMENT

This Card Agreement, which includes your card carrier, is your contract with us and governs the use of your card and account. The card carrier contains important account information, including your annual percentage rates and the amount of any membership fee. Please read and keep these documents for your records.

## FACTS ABOUT RATES AND FEES

For complete information about these facts, please see the related sections in this Card Agreement.

### RATES—FINANCE CHARGES

**Purchase and Cash Advance APRs:** See card carrier. All APRs based on the Prime Rate may vary each billing period.
**Default APR:** See card carrier. The Default APR equals the Prime Rate plus up to 23.99%, or up to 28.99%, whichever is greater. All APRs may automatically increase up to the Default APR if you fail to make a payment to us when due, exceed your credit line, or make a payment to us that is not honored.
**Minimum Finance Charge:** $0.50.

### TRANSACTION FEES—FINANCE CHARGES

**Balance Transfer Fee:** 3% of each balance transfer, $5 minimum, $75 maximum.

**Purchases Made in a Foreign Currency Fee:** 3% of each purchase after its conversion into U.S. dollars.

**Cash Advance Fee:** 3% of each cash advance, $5 minimum.

### OTHER FEES.

**Late Fee:** $15 on balances up to $100; $29 on balances of $100 up to $250; $39 on balances of $250 and over.
**Over-the-Credit-Line Fee:** $39.
**Annual Membership Fee:** See card carrier.
**Returned Payment Fee:** $39.
**Returned Convenience Check Fee:** $35.
**Stop Payment on Convenience Check Fee:** $39.

**Rates, fees, and terms may change.** We may change the rates, fees, and terms of your account at any time for any reason. These reasons may be based on information in your credit report, such as your failure to make payments to another creditor when due, amounts owed to other creditors, the number of credit accounts outstanding, or the number of credit inquiries. These reasons may also include competitive or market-related factors. If we make a change for any of these reasons, you will receive advance notice and a right to opt out in accordance with applicable law.

## Definitions

**account:** the relationship established between you and us by this Card Agreement.

**APR:** annual percentage rate.

**authorized user:** any person you allow to use your account.

**card:** one or more cards or other account access devices, including account numbers, that we issue to you to obtain credit under this Card Agreement.

**Card Agreement (or Agreement):** this document and the card carrier.

**we, us, and our:** Citibank (South Dakota), N.A., the issuer of your account.

**you, your, and yours:** the person who applied to open the account and any other person responsible for complying with this Agreement, including the person to whom we address billing statements.

## Your Account

You agree to use your account in accordance with this Agreement. This Agreement is binding on you unless you cancel your account within 30 days after receiving the card and you have not used or authorized use of the card. You must pay us for all amounts due on your account as specified in this Agreement. Your account must only be used for lawful transactions.

**Authorized Users:** You may allow authorized users to use your account. You may request additional cards for authorized users. You must pay us for all charges made by authorized users even if you did not intend to be responsible for those charges. You must notify us to revoke any permission you give to an authorized user to use a card or to use your account.

**Credit Line:** Your initial credit line appears on the card carrier. The full amount of your credit line is available to buy or lease goods or services where the card is honored. Part of your credit line, called the cash advance limit, is available for cash advances. We may change your credit line or cash advance limit at any time for any reason. We will notify you of any change, but the change may take effect before you receive the notice. The total balance on your account, including periodic finance charges and fees, must always remain below the credit line. However, if the total balance exceeds your credit line you must still pay us. If your account has a credit balance, we may reduce the credit balance by any new charges on your account. You may not maintain a credit balance in excess of your credit line.

**Billing Statement:** Your billing statement shows the total balance, periodic finance charges, fees, minimum amount

due, and payment due date. It also shows your current credit line and cash advance limit, an itemized list of current charges, payments and credits, a rate summary and other important information. We deliver a statement to only one address. You must notify Customer Service of a change in address. If we deem your account uncollectible or institute collection proceedings by sending it to an outside agency or attorney for collection, we may stop sending your statements. Periodic finance charges and fees continue to accrue even if we stop sending statements.

The total amount you owe us appears as the New Balance on the billing statement. To determine the New Balance we begin with the total balance at the start of the billing period. We add any purchases or cash advances and subtract any credits or payments credited as of that billing period. We then add any periodic finance charges or fees and make other adjustments.

## APRs

**APRs Based on Prime:** We calculate any APR based on the U.S. Prime Rate ("Prime Rate") by adding the applicable amount that appears on the card carrier to the Prime Rate. For each billing period we use the Prime Rate published in *The Wall Street Journal* two business days prior to the Statement/Closing Date for that billing period. If *The Wall Street Journal* does not publish the Prime Rate, we may substitute a similar published rate. A change in an APR due to a change in the Prime Rate takes effect as of the first day of the billing period for which we calculate the APR. We apply the new applicable APR to any existing balances, subject to any promotional rate that may apply.

**Default Rate:** All your APRs may increase if you default under any Card Agreement that you have with us because you fail to make a payment to us when due, you exceed your credit line, or you make a payment to us that is not honored. In these circumstances, we may automatically increase your APRs (including any promotional APRs) on all balances to the Default APR, which equals the Prime Rate plus up to 23.99%, or up to 28.99%, whichever is greater. Factors considered in determining your Default APR may include how long your account has been open, the timing or seriousness of a default under any Card Agreement that you have with us, or other indications of account performance. The Default APR takes effect as of the first day of the billing period in which you default. We may lower the APR for new purchases and/or cash advances if you meet the terms of all Card Agreements that you have with us for six consecutive billing periods. Existing balances remain subject to the Default APR until paid in full, unless we tell you otherwise.

2

3

Effect of APR Increases: If an APR increases, periodic finance charges increase and your minimum payment may increase.

## Periodic Finance Charges Based On APRs

**Periodic Finance Charges:** Periodic finance charges are finance charges that are added to your account when we apply the applicable APR to the balances on your account. We calculate periodic finance charges separately for each balance subject to different terms, for example, standard purchases, standard cash advances, and each promotional offer. The total periodic finance charge for the billing period equals the daily periodic finance charges for each balance for each day in the billing period. This method of calculating periodic finance charges results in daily compounding of finance charges.

**When Periodic Finance Charges Begin to Accrue:** Periodic finance charges begin to accrue on a charge from the date it is added to the daily balance and continue to accrue until payment in full is credited to your account. (Charges include purchases, balance transfers, cash advances, transaction fees, other fees, and any minimum finance charge.) You can avoid periodic finance charges on purchases (excluding balance transfers) that appear on your current billing statement if you paid the New Balance on the last statement by the payment due date on that statement and you pay your New Balance by the payment due date on your current statement. If you made a balance transfer, you may be unable to avoid periodic finance charges on new purchases, as described in the balance transfer offer.

**Calculation of Periodic Finance Charges:**

• For each balance, we multiply the daily balance by the applicable daily periodic rate. We do this for each day in the billing period. A daily periodic rate is the applicable APR divided by 365. A billing period begins on the day after the Statement/Closing Date of the previous billing period and includes the Statement/Closing Date of the current billing period.

• To get the daily balance, we take the beginning balance for each balance every day (including unpaid periodic finance charges from previous billing periods), add any new charges, and any periodic finance charge on the previous day's balance, subtract any credits or payments credited as of that day, and make other adjustments. A credit balance is treated as a balance of zero.

• We add a charge to the daily balance as follows: We add a purchase to the appropriate balance as of the Sale Date on the billing statement. We add a balance transfer or cash advance to the appropriate balance as of the Post Date on the statement. We add any transaction fees for purchases,

balance transfers, or cash advances to the same balance as the transaction as of the same date the transaction is added to the daily balance. The Post Date is the date we receive your request for the balance transfer or cash advance, including a request that we complete a balance transfer or cash advance convenience check for a specific amount. If you send a balance transfer or convenience check directly to someone, the Post Date is the date we receive the check for payment.

• To get the total periodic finance charge, we add up all of the daily periodic finance charges for each balance for each day in the billing period.

• For each balance, the Balance Subject to Finance Charge on the statement is the average of the daily balances during the billing period. If you multiply this figure for each balance by the number of days in the billing period and by the applicable daily periodic rate, the result is the periodic finance charges assessed for that balance, except for minor variations caused by rounding.

**Minimum Finance Charge:** If the periodic rate finance charge would otherwise be less than $0.50, we assess a minimum FINANCE CHARGE of $0.50. We add the amount to any balance that is assessed a finance charge.

## Transaction Fees

**Transaction Fees and APRs:** If you are assessed a transaction fee for a balance transfer, a purchase made in a foreign currency, or a cash advance, the transaction fee will cause the APR on the billing statement on which the transaction first appears to exceed your nominal APR.

**Transaction Fee for Balance Transfers:** You obtain a balance transfer if you obtain funds through a balance transfer check or transfer a balance without using a cash advance convenience check. We treat balance transfers as purchases unless otherwise provided in this Agreement. For each balance transfer we add an additional FINANCE CHARGE of 3% of the amount of the balance transfer, but not less than $5 or more than $75.

**Transaction Fee for Purchases Made in a Foreign Currency:** For each purchase made in a foreign currency we add an additional FINANCE CHARGE of 3% of the purchase amount after its conversion into U.S. dollars.

**Transaction Fee for Cash Advances:** You obtain a cash advance if you obtain funds through an automated teller machine (ATM), convenience check, home banking, or financial institution, make a wire transfer; obtain a money order, traveler's check, lottery ticket, casino chip, or similar item; or engage in a similar transaction. For each cash

4.

5

advance we add an additional **FINANCE CHARGE** of 3% of the amount of the cash advance, but not less than $5.

## Other Fees

**Late Fee:** We add a late fee to the standard purchase balance for each billing period you fail to pay by its due date, the Minimum Amount Due (less the Amount Over Credit Line shown on your billing statement). This fee is based on your account balance as of the payment due date. It is $15 on balances up to $100, $29 on balances of $100 up to $250, and $39 on balances of $250 and over.

**Over-the-Credit-Line Fee:** We add a $39 fee to the standard purchase balance if your account balance exceeds your credit line at any time during the billing period. We add this fee even if transactions we authorize or periodic finance charges, fees, and other charges you incur are a reason the account balance exceeds your credit line. We add this fee even if the account balance falls below your credit line by the end of the billing period.

**Annual Membership Fee:** We add any applicable annual membership fee to the standard purchase balance. This fee is non-refundable unless you notify us to cancel your account within 30 days of the mailing or delivery date of the billing statement on which the fee is billed.

**Returned Payment Fee:** We add a $39 fee to the standard purchase balance if a payment check or similar instrument is not honored or is returned because it cannot be processed, or if an automatic debit is returned unpaid. We assess this fee the first time your check or payment is not honored, even if it is honored upon resubmission.

**Returned Convenience Check Fee:** We add a $39 fee to the standard advance balance if we decline to honor a convenience check. We may decline to honor these checks if, for example, the amount of the check would cause the balance to exceed the cash advance limit or credit line, if you default, if you did not comply with our instructions regarding the check, or if your account has been closed.

**Stop Payment on Convenience Check Fee:** We add a $39 fee to the standard advance balance if we honor your request to stop payment on a convenience check. To stop payment on a convenience check write us at P.O. Box 6500, Sioux Falls, South Dakota 57117, or call the Customer Service number on the billing statement. If you call, you must confirm the call in writing within 14 days. A written stop payment order remains in effect for 6 months unless renewed in writing.

**Balance Transfer Checks and Convenience Checks:** Each check must be in the form it was issued and used according

to any instructions we give. The checks must not be used to pay an amount owed us under this or another Card Agreement that you have with us. We do not certify these checks or return any such checks that have been paid.

## Information on Foreign Currency Conversion Procedures

If you make a transaction in a foreign currency, other than a cash advance made at a branch or ATM of one of our affiliates, MasterCard, Visa or American Express, depending on which card is used, converts the amount into U.S. dollars as follows:

- MasterCard complies with its foreign currency conversion procedures then in effect. MasterCard currently uses a conversion rate in effect one day prior to its transaction processing date. Such rate is either a wholesale market rate or the government-mandated rate.
- Visa complies with its foreign currency conversion procedures then in effect. Visa currently uses a conversion rate in effect on its applicable central processing date. Such rate is either a rate it selects from the range of rates available in wholesale currency markets, which may vary from the rate it receives, or the government-mandated rate.
- American Express complies with its foreign currency conversion procedures then in effect. Unless a particular rate is required by applicable law, the rate used by American Express shall be the highest interbank rate selected on the business day prior to the day on which the transaction is processed by American Express.

If a cash advance is made in a foreign currency at a branch or ATM of one of our affiliates, the amount is converted into U.S. dollars by our affiliate in accordance with its foreign currency conversion procedures then in effect. Our affiliate currently uses a conversion rate in effect on its applicable processing date. Such rate is either a mid-point market rate or the government-mandated rate.

The foreign currency conversion rate in effect on the applicable processing date for a transaction may differ from the rate in effect on the Sale or Post date on your billing statement for that transaction.

If a transaction is converted by a third party prior to such transaction being processed by MasterCard, Visa, or American Express, the foreign currency conversion rate for that transaction will be the rate selected by that third party.

## Payments

**Minimum Amount Due:** Each month you must pay at least the Minimum Amount Due by the payment due date. The

sooner you pay the New Balance, the less you will pay in periodic finance charges.

To calculate the Minimum Amount Due, we begin with any past due amount and add any amount in excess of your credit line. We then add the largest of the following:

- The New Balance on the billing statement if it is less than $20;
- $20 if the New Balance is at least $20;
- 1% of the New Balance (which calculation is rounded down to the nearest dollar) plus the amount of your billed finance charges and any applicable late fee; or
- 1.5% of the New Balance (which calculation is rounded down to the nearest dollar).

However, the Minimum Amount Due never exceeds the New Balance. In calculating the Minimum Amount Due, we may subtract from the New Balance certain fees added to your account during the billing period.

**Application of Payments:** We apply payments and credits to low APR balances before higher APR balances. That means your savings will be reduced if you make transactions that are subject to higher APRs.

**Payment Instructions:** Payments are credited in accordance with the payment instructions on the billing statement. You must pay us in U.S. dollars using a check, similar instrument, or automatic debit that is drawn on and honored by a bank in the U.S. Do not send cash. We can accept late or partial payments and payments that reflect "paid in full" or other restrictive endorsements, without losing our rights. We reserve the right to accept payments made in foreign currency and instruments drawn on funds on deposit outside the U.S. If we do, we select the currency conversion rate at our discretion and credit your account in U.S. dollars after deducting any costs incurred in processing your payment, or we may bill you separately for such costs.

**Optional Pay by Phone Service:** You may request to make your payment by phone using our optional Pay by Phone Service. Each time you make such a request, you agree to pay us the amount shown in the Pay by Phone section on the back of the billing statement. Our representatives are trained to tell you this amount if you decide to use this optional Pay by Phone Service.

### Credit Reporting

We may report information about your account to credit reporting agencies. Late payments, missed payments, or other defaults on your account may appear on your credit report. If you request cards on your account for others, we may report account information in the names of those other

people as well. We may also obtain follow-up credit reports on you (for example, when we review your account for a credit line increase). If you wish to know which agencies we contacted, write us at the Customer Service address on the billing statement.

If you think we reported erroneous information to a credit reporting agency, write us at the Customer Service address on the billing statement. We will promptly investigate the matter and if we agree with you, we will contact each credit reporting agency to which we reported and request a correction. If, after our investigation, we disagree with you, we will tell you in writing or by telephone and tell you how to submit a statement to those agencies for inclusion in your credit report.

### Changes to this Agreement

We may change the rates, fees, and terms of this Agreement at any time for any reason. These reasons may be based on information in your credit report, such as your failure to make payments to another creditor when due, amounts owed to other creditors, the number of credit accounts outstanding, or the number of credit inquiries. These reasons may also include competitive or market-related factors. Changing terms includes adding, replacing, or deleting provisions relating to your account and to the nature, extent, and enforcement of the rights and obligations you or we have relating to this Agreement. These changes are binding on you. However, if the change will cause a fee, rate or minimum payment to increase, we will mail you written notice at least 15 days before the beginning of the billing period in which the change becomes effective. If you do not agree to the change, you must notify us in writing within 25 days after the effective date of the change and pay us the total balance, either at once or under the terms of the unchanged Agreement. Unless we notify you otherwise, use of the card after the effective date of the change shall be deemed acceptance of the new terms, even if the 25 days have not expired.

### Default

You default under this Agreement if you fail to pay the Minimum Amount Due by its due date; exceed your credit line; pay by a check or similar instrument that is not honored or that we must return because it cannot be processed; pay by automatic debit that is returned unpaid; file for bankruptcy; or default under any other Card Agreement that you have with us. If you default, we may close your account and demand immediate payment of the total balance. If you gave us a security interest in a Certificate of Deposit, we may use the deposit amount to pay any amount you owe.

8

9

## Refusal of the Card, Closed Accounts, and Related Provisions

**Refusal of the Card:** We do not guarantee approval of transactions and are not liable for transactions that are not approved, either by us or by a third party, even if you have sufficient credit available. We may limit the number of transactions that may be approved in one day. If we detect unusual or suspicious activity, we may suspend your credit privileges until we can verify the activity.

**Preauthorized Charges:** If you default, if the card is lost or stolen, or if we change your account for any reason, we may suspend automatic charges with third party vendors. If preauthorized charges are suspended, you are responsible for making direct payment for such charges until you contact the third party to reinstate the automatic charges.

**Lost or Stolen Cards, Account Numbers, or Convenience and Balance Transfer Checks:** If any card account number or check is lost or stolen or if you think someone used or may use them without permission, call us at the Customer Service number on the billing statement or the number obtained by calling toll-free or local Directory Assistance. We may require you to provide certain information in writing to help us find out what happened and to comply with our investigation. You must identify for us the charges that were not made by you, or someone authorized by you, and from which you received no benefit.

**Closing Your Account:** You may close your account by notifying us in writing or by calling toll-free at the Customer Service number shown on the billing statement or on the back of your credit card, but must still repay the total balance in accordance with this Agreement. We may close your account or suspend account privileges at any time for any reason without prior notice. We may also reissue a different card at any time. You must return any card to us upon request.

**Security Interest for Secured Accounts:** If your account is a secured account, you gave us a security interest in a Certificate of Deposit to secure repayment of your account. If you withdraw your funds from the Certificate of Deposit, we will close your account.

## ARBITRATION

*PLEASE READ THIS PROVISION OF THE AGREEMENT CAREFULLY. IT PROVIDES THAT ANY DISPUTE MAY BE RESOLVED BY BINDING ARBITRATION. ARBITRATION REPLACES THE RIGHT TO GO TO COURT, INCLUDING THE RIGHT TO A JURY AND THE RIGHT TO PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING. IN ARBITRATION,*

A DISPUTE IS RESOLVED BY AN ARBITRATOR INSTEAD OF A JUDGE OR JURY. ARBITRATION PROCEDURES ARE SIMPLER AND MORE LIMITED THAN COURT PROCEDURES.

*Agreement to Arbitrate:* Either you or we may, without the other's consent, elect mandatory, binding arbitration for any claim, dispute, or controversy between you and us (called "Claims").

### Claims Covered

**What Claims are subject to arbitration?** All Claims relating to your account, a prior related account, or our relationship are subject to arbitration, including Claims regarding the application, enforceability, or interpretation of this Agreement and this arbitration provision. All Claims are subject to arbitration, no matter what legal theory they are based on or what remedy (damages, or injunctive or declaratory relief) they seek. This includes Claims based on contract, tort (including intentional tort), fraud, agency, your or our negligence, statutory or regulatory provisions, or any other sources of law; Claims made as counterclaims, cross-claims, third-party claims, interpleaders or otherwise; and Claims made independently or with other claims. A party who initiates a proceeding in court may elect arbitration with respect to any Claim advanced in that proceeding by any other party. Claims and remedies sought as part of a class action, private attorney general or other representative action are subject to arbitration on an individual (non-class, non-representative) basis, and the arbitrator may award relief only on an individual (non-class, non-representative) basis.

**Whose Claims are subject to arbitration?** Not only ours and yours, but also Claims made by or against anyone connected with us or you or claiming through us or you, such as a co-applicant or authorized user of your account, an employee, agent, representative, affiliated company, predecessor or successor, heir, assignee, or trustee in bankruptcy.

**What time frame applies to Claims subject to arbitration?** Claims arising in the past, present, or future, including Claims arising before the opening of your account, are subject to arbitration.

**Broadest Interpretation.** Any questions about whether Claims are subject to arbitration shall be resolved by interpreting this arbitration provision in the broadest way the law will allow it to be enforced. This arbitration provision is governed by the Federal Arbitration Act (the "FAA").

**What about Claims filed in Small Claims Court?** Claims filed in a small claims court are not subject to arbitration, so long as the matter remains in such court and advances only an individual (non-class, non-representative) Claim.

10

11

## How Arbitration Works

How does a party initiate arbitration? The party filing an arbitration must choose one of the following two arbitration firms and follow its rules and procedures for initiating and pursuing an arbitration: American Arbitration Association or National Arbitration Forum. Any arbitration hearing that you attend will be held at a place chosen by the arbitration firm in the same city as the U.S. District Court closest to your then current billing address, or at some other place to which you and we agree in writing. You may obtain copies of the current rules of each of the arbitration firms and forms and instructions for initiating an arbitration by contacting them as follows:

American Arbitration Association
335 Madison Avenue, Floor 10
New York, NY 10017-4605
Web site: www.adr.org

National Arbitration Forum
P.O. Box 50191
Minneapolis, MN 55405
Web site: www.arbitration-forum.com

At any time you or we may ask an appropriate court to compel arbitration of Claims, or to stay the litigation of Claims pending arbitration, even if such Claims are part of a lawsuit, unless a trial has begun or a final judgment has been entered. Even if a party fails to exercise these rights at any particular time, or in connection with any particular Claims, that party can still require arbitration at a later time or in connection with any other Claims.

What procedures and law are applicable in arbitration? A single, neutral arbitrator will resolve Claims. The arbitrator will be either a lawyer with at least ten years experience or a retired or former judge, selected in accordance with the rules of the arbitration firm. The arbitration will follow procedures and rules of the arbitration firm in effect on the date the arbitration is filed unless those procedures and rules are inconsistent with this Agreement, in which case this Agreement will prevail. Those procedures and rules may limit the discovery available to you or us. The arbitrator will take reasonable steps to protect customer account information and other confidential information if requested to do so by you or us. The arbitrator will apply applicable substantive law consistent with the FAA and applicable statutes of limitations, will honor claims of privilege recognized at law, and will have the power to award to a party any damages or other relief provided for under applicable law. You or we may choose to have a hearing and be represented by counsel. The arbitrator will make any award in writing and, if requested by you or us,

will provide a brief statement of the reasons for the award. An award in arbitration shall determine the rights and obligations between the named parties only, and only in respect of the Claims in arbitration, and shall not have any bearing on the rights and obligations of any other person, or on the resolution of any other dispute.

Who pays? Whoever files the arbitration pays the initial filing fee. If we file, we pay; if you file, you pay, unless you get a fee waiver under the applicable rules of the arbitration firm. If you have paid the initial filing fee and you prevail, we will reimburse you for that fee. If there is a hearing, we will pay any fees of the arbitrator and arbitration firm for the first day of that hearing. All other fees will be allocated as provided by the rules of the arbitration firm and applicable law. However, we will advance or reimburse your fees if the arbitration firm or arbitrator determines there is good reason for requiring us to do so, or at you ask us and we determine there is good reason for doing so. Each party will bear the expense of that party's attorneys, experts, and witnesses, and other expenses, regardless of which party prevails, but a party may recover any or all expenses from another party if the arbitrator, applying applicable law, so determines.

Who can be a party? Claims must be brought in the name of an individual person or entity and must proceed on an individual (non-class, non-representative) basis. The arbitrator will not award relief for or against anyone who is not a party. If you or we require arbitration of a Claim, neither you, we, nor any other person may pursue the Claim in arbitration as a class action, private attorney general action or other representative action, nor may such Claim be pursued on your or our behalf in any litigation in any court. Claims, including assigned Claims, of two or more persons may not be joined or consolidated in the same arbitration. However, applicants, co-applicants, authorized users on a single account and/or related accounts, or corporate affiliates are here considered as one person.

When is an arbitration award final? The arbitrator's award is final and binding on the parties unless a party appeals it in writing to the arbitration firm within fifteen days of notice of the award. The appeal must request a new arbitration before a panel of three neutral arbitrators designated by the same arbitration firm. The panel will consider all factual and legal issues anew, follow the same rules that apply to a proceeding using a single arbitrator, and make decisions based on the vote of the majority. Costs will be allocated in the same way they are allocated for arbitration before a single arbitrator. An award by a panel is final and binding on the parties after fifteen days has passed. A final and binding award is subject

to judicial review and enforcement as provided by the FAA or other applicable law.

## Survival and Severability of Terms

This arbitration provision shall survive: (i) termination or changes in the Agreement, the account, or the relationship between you and us concerning the account; (ii) the bankruptcy of any party; and (iii) any transfer, sale or assignment of your account, or any amounts owed on your account, to any other person or entity. If any portion of this arbitration provision is deemed invalid or unenforceable, the entire arbitration provision shall not remain in force. No portion of this arbitration provision may be amended, severed or waived absent a written agreement between you and us.

## Applicable Law and Enforcing our Rights

**Applicable Law:** The terms and enforcement of this Agreement shall be governed by federal law and the law of South Dakota, where we are located.

**Enforcing this Agreement:** We can delay in enforcing or fail to enforce any of our rights under this Agreement without losing them.

**Collection Costs:** If we refer collection of your account to a lawyer who is not our salaried employee, you are liable for any reasonable attorney's fees we incur, plus the costs and expenses of any legal action, to the extent permitted by law.

**Assignment:** We may assign any or all of our rights and obligations under this Agreement to a third party.

## For Further Information

Call the toll-free Customer Service telephone number shown on the billing statement or on the back of your card. You can also call local or toll-free Directory Assistance to get our telephone number.

Ken Stork
President & CEO

Citibank (South Dakota), N.A.
P.O. Box 6000
Sioux Falls, SD 57117

© 2006 Citibank (South Dakota), N.A.

14

## What To Do If There's An Error In Your Bill

**Your Billing Rights. Keep This Notice For Future Use.**
This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

**Notify Us In Case of Errors or Questions About Your Bill.**
If you think your billing statement is wrong, or if you need more information about a transaction on your billing statement, write to us (on a separate sheet) as soon as possible at the address provided in the Billing Rights Summary portion on the back of your statement. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:
- Your name and account number.
- The dollar amount of the suspected error.
- Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.
- Please sign your letter.

If you authorized us to pay your credit card bill automatically from your savings or checking account, you can stop the payment on any amount you think is wrong. To stop the payment you must tell us at least three business days before the automatic payment is scheduled to occur.

**Your Rights and Our Responsibilities After We Receive Your Written Notice.**
We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we must either correct the error or explain why we believe your billing statement was correct. After we receive your letter, we cannot try to collect any amount you question, or report your account as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your credit line. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your balance that are not in question.

If we find that we made a mistake on your billing statement, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date it is due.

15

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within 10 days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And, we must tell you the name and address of anyone to whom we reported your account information. We must tell anyone we report you to that the matter has been settled between us when it is finally settled.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your billing statement was correct.

**Special Rule for Credit Card Purchases.**
If you have a problem with the quality of property or services that you purchased with a credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the property or services. There are two limitations on this right:

- You must have made the purchase in your home state or, if not within your home state, within 100 miles of your current address; and
- The purchase price must have been more than $50.

These limitations do not apply if we own or operate the merchant, or if we mailed you the advertisement for the property or services.

© 2006 Citibank (South Dakota), N.A.

EXHIBIT "C"

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
FIRST MUNICIPAL DISTRICT

| | |
|---|---|
| RESURGENCE FINANCIAL, LLC, an Illinois Limited Liability Company | ) |
| | )    Case No. |
| | ) |
| Plaintiff | ) |
| v. | ) |
| DIONISIA BARRERA | ) |
| | ) |
| Defendant(s). | ) |
| | ) |
| | ) |
| | ) |

### AFFIDAVIT OF CLAIM

I, Eileen M. Mahon, an employee of Resurgence Financial, LLC, being first duly sworn upon my oath depose and state as follows:

1.    I am over the age of 21, under no legal disability, and if called and sworn as a witness in this cause, would testify that I have personal knowledge of the facts set forth in this petition.

2.    I am employed by Resurgence Financial, LLC, an Illinois Limited Liability Company ("Resurgence").

3.    Resurgence is proceeding in this matter on an assignment from UNIFUND.

4.    I am familiar with the account of DIONISIA BARRERA with Resurgence.

5.    I am familiar with the computer records of Resurgence and how to search the records of Resurgence to determine the status of accounts with our company.

6.    I have the authority to review the computer records of Resurgence.

7.    I have reviewed the records of Resurgence, which reflect that DIONISIA BARRERA was issued a credit card by CITIBANK SOUTH DAKOTA NA / CLASSIC, with an account number of ████████2504 and that the issuer, CITIBANK SOUTH DAKOTA NA / CLASSIC charged off said account on June 7, 2006, as a result of Defendant defaulting in making payments pursuant to the Cardmember Agreement.

8.    I have reviewed the computer records of Resurgence. There is a balance due to Resurgence on this account in the amount of $8,750.18 and Resurgence has not received payment.

FURTHER, THE AFFIANT SAYETH NAUGHT.

| |
|---|
| **"OFFICIAL SEAL"** |
| TRESSA I PECK |
| Notary Public, State of Illinois |
| My Commission Expires 11/4/2009 |

*Eileen M Mahon*

RESURGENCE FINANCIAL, LLC
By its duly authorized agent

EILEEN M. MAHON

SUBSCRIBED AND SWORN TO
before me this 15th day of April _____, 20 08 ___.

_____
NOTARY PUBLIC

R0060514

STATE OF ILLINOIS

UNITED STATES OF AMERICA

COUNTY OF COOK

FIRST MUNICIPAL DISTRICT

RESURGENCE FINANCIAL, LLC, an Illinois
Limited Liability Company,

             Plaintiff

        v.

DIONISIA BARRERA

             Defendant(s)

CASE NUMBER

FILE STAMP HERE

## AFFIDAVIT TO MILITARY SERVICE

Resurgence Financial LLC, by its duly authorized agent, being first duly sworn upon my oath depose and states:

With respect to (each) defendant, DIONISIA BARRERA, ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮

☐     the Defendant is

☒     the Defendant is not

☐     I am unable to determine whether the Defendant is

in the military service of the United States of America.

This affidavit is based on these facts:  I searched on the Department of Defense website:  www.dmdc.osd.mil/scra/owa/home
and the report indicated that the Defendant (is) (is not) on active military duty.

```
"OFFICIAL SEAL"
TRESSA I PECK
Notary Public, State of Illinois
My Commission Expires 11/4/2009
```

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil
Procedure, the above signed certifies that the statements set forth in this instrument
are true and correct, except as to matters therein stated to be on the information and
belief and as to such matters the above signed certifies as aforesaid that s/he believes
the same to be true.

Sworn and Subscribed before me
this 15th day of April, 2008

NOTARY PUBLIC

EILEEN M. MAHON

RESURGENCE FINANCIAL, LLC
Legal Department
100 Commercial Avenue
Northbrook, IL 60062
47/656-2200
41776

# APPENDIX C

R0060819

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
FIRST MUNICIPAL DISTRICT

RESURGENCE FINANCIAL, LLC, an Illinois )
Limited Liability Company )
) Case No.
)
Plaintiff ) Amount Claimed: $1,298.04
)
v. ) Return Date:
)
CHEYENNE FELTON ) JUN 9 2008
Defendant(s). )
)
)
)
)

## VERIFIED COMPLAINT AT LAW

RESURGENCE FINANCIAL, LLC, an Illinois Limited Liability Company ("Plaintiff"), by and through one of

its staff attorneys, complains of CHEYENNE FELTON ("Defendant"), as follows:

1.      Pursuant to 735 ILCS 5/2-403, Plaintiff is proceeding in this cause as the Assignee of CITIBANK SOUTH

DAKOTA NA / CITI DIAMOND PREFERRED REWARDS ("CITIBANK SOUTH DAKOTA NA / CITI DIAMOND

PREFERRED REWARDS"), as set forth in the Bill of Sale attached hereto, made a part hereof and marked as Exhibit

"A".

2.      CITIBANK SOUTH DAKOTA NA / CITI DIAMOND PREFERRED REWARDS and Defendant entered into

a Cardmember Agreement ("Agreement"), wherein CITIBANK SOUTH DAKOTA NA / CITI DIAMOND PREFERRED

REWARDS issued a credit card account number ▒▒▒▒▒▒▒5220 to Defendant and Defendant agreed to pay all

amounts charged by the use if the card. A copy of the Agreement containing the terms and conditions governing the use

of the credit card is attached hereto, made a part here of and marked as Exhibit "B".

3.      Defendant resides in the State of Illinois.

4.      Thereafter, Defendant incurred charges by use of the credit card.

5.      As set forth in the Affidavit of Plaintiff, attached hereto, made a part hereof and marked as Exhibit "C", there

is now due and owing from Defendant to Plaintiff the sum of $1,298.04, of which no part has been paid, although duly

demanded.

WHEREFORE, Plaintiff, Resurgence Financial, LLC, an Illinois Limited Liability Company, demands a judgment against the Defendant(s) CHEYENNE FELTON, in the sum of $1,298.04, plus court costs.

Respectfully Submitted,

RESURGENCE FINANCIAL, LLC,
an Illinois Limited Liability Company,
Plaintiff herein,

_____
By One of Its Staff Attorneys
Conrad Noll IV, Esq.

VERIFICATION

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information an belief, and as to such matters the undersigned certifies as aforesaid that s/he verily believes the same to be true.

_____
RESURGENCE FINANCIAL, LLC
By One of Its Attorneys
Conrad Noll IV, Esq.

RESURGENCE FINANCIAL, LLC
Legal Department
4100 Commercial Avenue
Northbrook, IL 60062
847/656-2200
Firm No. 41776

EXHIBIT "A"

## BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT is dated as of November 29, 2007, between Citibank (South Dakota), N.A., a national banking association organized under the laws of the United States, located at 701 East 60th Street North, Sioux Falls, SD 57117 (the "Bank") and Unifund Portfolio A, LLC ("Buyer"), with its headquarters/principal place of business at 10625 Techwoods Circle, Cincinnati, OH 45242.

For value received and subject to the terms and conditions of the Purchase and Sale Agreement dated November 29, 2007, between Buyer and the Bank (the "Agreement"), the Bank does hereby transfer, sell, assign, convey, grant, bargain, set over and deliver to Buyer, and to Buyer's successors and assigns, all of the Bank's right, title and interest in and to the Accounts described in Section 1.2 of the Agreement.

Except as provided for in the Agreement, this Bill of Sale, Assignment and Assumption Agreement is executed without recourse and without representations or warranties including, without limitation, warranties as to collectibility.

Citibank (South Dakota), N.A.

By: _____
              (Signature)

Name: Douglas C. Morrison

Title: Vice President & CFO

Unifund Portfolio A, LLC

By: _____
              (Signature)

Name: Henry N. Thomas

Title: Vice President



Unifund CCR Partners

BILL OF SALE

Unifund CCR Partners, for value received and in accordance with the terms of the Accounts Receivable Purchase Agreement by and among Unifund CCR Partners and Resurgence Financial, LLC ("Purchaser"), dated as of March 4th, 2008 (the "Agreement"), does hereby sell, assign, and transfer to Purchaser all of its good and marketable title, free and clean of all liens, claims and encumbrances in and to the Accounts listed in the Account Schedule attached as Appendix A to the Agreement, without recourse and without representation or warranty of collectibility, or otherwise, except to the extent stated in the Agreement.

Executed on March 4th, 2008.

UNIFUND CCR PARTNERS

By
Joel Rosenthal
Director, Sales and Marketing

23

**AFFIDAVIT**

I, Joel Rosenthal, as Director of Sales and Marketing, for the Unifund Group, being duly sworn, deposes, and says:

1. Unifund CCR Partners is a New York General Partnership, and is the operating company for the Unifund Group.

2. Unifund Portfolio A, LLC is an Ohio limited liability company.

3. Unifund CCR Partners and Unifund Portfolio A, LLC share 100% common ownership.

4. Unifund Portfolio A, LLC purchased various portfolios of accounts from multiple sellers.

5. In accordance with a Servicing Agreement between Unifund CCR Partners and Unifund Portfolio A, LLC dated July 6, 2001; Unifund CCR Partners has the right and authority to sell accounts on behalf of Unifund Portfolio A, LLC.

6. Pursuant to such right and authority, Unifund CCR Partners sold a portfolio of 1897 accounts to Resurgence Financial, LLC via a Purchase Agreement and Bill of Sale dated March 10, 2008, on behalf of Unifund Portfolio A, LLC.

**Further Affiant Sayeth Not.**

_____
Joel Rosenthal
Director of Sales and Marketing
Unifund CCR Partners

I do certify that the above sworn statement was duly taken and subscribed in my presence, this 17th day of _March_, 2007.

_____
Notary Public

JENNIFER A DUNCAN
NOTARY PUBLIC
STATE OF OHIO
Comm. Expires
July 04, 2012

# EXHIBIT "B"

# CARD AGREEMENT

This Card Agreement, which includes your card carrier, is your contract with us and governs the use of your card and account. The card carrier contains important account information, including your annual percentage rates and the amount of any membership fee. Please read and keep these documents for your records.

## FACTS ABOUT RATES AND FEES

For complete information about these facts, please see the related sections in this Card Agreement.

### RATES—FINANCE CHARGES

**Purchase and Cash Advance APR:** See card carrier. All APRs based on the Prime Rate may vary each billing period. **Default APR:** See card carrier. The Default APR equals the Prime Rate plus up to 23.99%, or up to 28.99%, whichever is greater. All APRs may automatically increase up to the Default APR if you fail to make a payment to us when due, exceed your credit line, or make a payment to us that is not honored.

**Minimum Finance Charge:** $0.50.

### TRANSACTION FEES—FINANCE CHARGES

**Balance Transfer Fee:** 3% of each balance transfer, $5 minimum, $75 maximum.

**Purchases Made in a Foreign Currency Fee:** 3% of each purchase after its conversion into U.S. dollars.

**Cash Advance Fee:** 3% of each cash advance, $5 minimum.

### OTHER FEES

**Late Fee:** $15 on balances up to $100; $29 on balances of $100 up to $250; $39 on balances of $250 and over.

**Over-the-Credit-Line Fee:** $39.

**Annual Membership Fee:** See card carrier.

**Returned Payment Fee:** $39.

**Returned Convenience Check Fee:** $39.

**Stop Payment on Convenience Check Fee:** $39.

**Rates, fees, and terms may change.** We may change the rates, fees, and terms of your account at any time for any reason. These reasons may be based on information in your credit report, such as your failure to make payments to another creditor when due, amounts owed to other creditors, the number of credit accounts outstanding, or the number of credit inquiries. These reasons may also include competitive or market-related factors. If we make a change for any of these reasons, you will receive advance notice and a right to opt out in accordance with applicable law.

## Definitions

*account:* the relationship established between you and us by this Card Agreement.

*APR:* annual percentage rate.

*authorized user:* any person you allow to use your account.

*card:* one or more cards or other account access devices, including account numbers, that we issue to you to obtain credit under this Card Agreement.

*Card Agreement (or Agreement):* this document and the card carrier.

*we, us, and our:* Citibank (South Dakota), N.A., the issuer of your account.

*you, your, and yours:* the person who applied to open the account and any other person responsible for complying with this Agreement, including the person to whom we address billing statements.

## Your Account

You agree to use your account in accordance with this Agreement. This Agreement is binding on you unless you cancel your account within 30 days after receiving the card and you have not used or authorized use of the card. You must pay us for all amounts due on your account as specified in this Agreement. Your account must only be used for lawful transactions.

**Authorized Users:** You may allow authorized users to use your account. You may request additional cards for authorized users. You must pay us for all charges made by authorized users even if you did not intend to be responsible for those charges. You must notify us to revoke any permission you give to an authorized user to use a card or to use your account.

**Credit Line:** Your initial credit line appears on the card carrier. The full amount of your credit line is available to buy or lease goods or services where the card is honored. Part of your credit line, called the cash advance limit, is available for cash advances. We may change your credit line or cash advance limit at any time for any reason. We will notify you of any change, but the change may take effect before you receive the notice. The total balance on your account, including periodic finance charges and fees, must always remain below the credit line. However, if the total balance exceeds your credit line you must still pay us. If your account has a credit balance, we may reduce the credit balance by any new charges on your account. You may not maintain a credit balance in excess of your credit line.

**Billing Statement:** Your billing statement shows the total balance, periodic finance charges, fees, minimum amount

due, and payment due date. It also shows your current credit line and cash advance limit, an itemized list of current charges, payments and credits, a rate summary, and other important information. We deliver a statement to only one address. You must notify Customer Service of a change in address. If we deem your account uncollectible or institute collection proceedings by sending it to an outside agency or attorney for collection, we may stop sending you statements. Periodic finance charges and fees continue to accrue even if we stop sending statements.

The total amount you owe us appears as the New Balance on the billing statement. To determine the New Balance we begin with the total balance at the start of the billing period. We add any purchases or cash advances and subtract any credits or payments credited as of that billing period. We then add any periodic finance charges or fees and make other adjustments.

## APRs

**APRs Based on Prime:** We calculate any APR based on the U.S. Prime Rate ("Prime Rate") by adding the applicable amount that appears on the card carrier to the Prime Rate. For each billing period we use the Prime Rate published in *The Wall Street Journal* two business days prior to the Statement/Closing Date for that billing period. If *The Wall Street Journal* does not publish the Prime Rate, we may substitute a similar published rate. A change in an APR due to a change in the Prime Rate takes effect as of the first day of the billing period for which we calculate the APR. We apply the new applicable APR to any existing balances, subject to any promotional rate that may apply.

**Default Rate:** All your APRs may increase if you default under any Card Agreement that you have with us because you fail to make a payment to us when due, you exceed your credit line, or you make a payment to us that is not honored. In these circumstances, we may automatically increase your APRs (including any promotional APRs) on all balances to the Default APR, which equals the Prime Rate plus up to 23.99%, or up to 28.99%, whichever is greater. Factors considered in determining your Default APR may include how long your account has been open, the timing or seriousness of a default under any Card Agreement that you have with us, or other indications of account performance. The Default APR takes effect as of the first day of the billing period in which you default. We may lower the APR for new purchases and/or cash advances if you meet the terms of all Card Agreements that you have with us for six consecutive billing periods. Existing balances remain subject to the Default APR until paid in full, unless we tell you otherwise.

2

3

**Effect of APR Increases:** If an APR increases, periodic finance charges increase and your minimum payment may increase.

## Periodic Finance Charges Based On APRs

**Periodic Finance Charges:** Periodic finance charges are finance charges that are added to your account when we apply the applicable APR to the balances on your account. We calculate periodic finance charges separately for each balance subject to different terms, for example, standard purchases, standard cash advances, and each promotional offer. The total periodic finance charge for the billing period equals the daily periodic finance charges for each balance for each day in the billing period. This method of calculating periodic finance charges results in daily compounding of finance charges.

**When Periodic Finance Charges Begin to Accrue:** Periodic finance charges begin to accrue on a charge from the date it is added to the daily balance and continue to accrue until payment in full is credited to your account. (Charges include purchases, balance transfers, cash advances, transaction fees, other fees, and any minimum finance charge.) You can avoid periodic finance charges on purchases (excluding balance transfers) that appear on your current billing statement if you paid the New Balance on the last statement by the payment due date on that statement and you pay your New Balance by the payment due date on your current statement. If you made a balance transfer, you may be unable to avoid periodic finance charges on new purchases, as described in the balance transfer offer.

**Calculation of Periodic Finance Charges:**

• For each balance, we multiply the daily balance by the applicable daily periodic rate. We do this for each day in the billing period. A daily periodic rate is the applicable APR divided by 365. A billing period begins on the day after the Statement/Closing Date of the previous billing period and includes the Statement/Closing Date of the current billing period.

• To get the daily balance, we take the beginning balance for each balance every day (including unpaid periodic finance charges from previous billing periods), add any new charges, and any periodic finance charge on the previous day's balance, subtract any credits or payments credited as of that day, and make other adjustments. A credit balance is treated as a balance of zero.

• We add a charge to the daily balance as follows: We add a purchase to the appropriate balance as of the Sale Date on the billing statement. We add a balance transfer or cash advance to the appropriate balance as of the Post Date on the statement. We add any transaction fees for purchases,

balance transfers, or cash advances to the same balance as the transaction as of the same date the transaction is added to the daily balance. The Post Date is the date we receive your request for the balance transfer or cash advance, including a request that we complete a balance transfer or cash advance convenience check for a specific amount. If you send a balance transfer or convenience check directly to someone, the Post Date is the date we receive the check for payment.

• To get the total periodic finance charge, we add up all of the daily periodic finance charges for each balance for each day in the billing period.

• For each balance, the Balance Subject to Finance Charge on the statement is the average of the daily balances during the billing period. If you multiply this figure for each balance by the number of days in the billing period and by the applicable daily periodic rate, the result is the periodic finance charges assessed for that balance, except for minor variations caused by rounding.

**Minimum Finance Charge:** If the periodic rate finance charge would otherwise be less than $0.50, we assess a minimum FINANCE CHARGE of $0.50. We add the amount to any balance that is assessed a finance charge.

## Transaction Fees

**Transaction Fees and APRs:** If you are assessed a transaction fee for a balance transfer, a purchase made in a foreign currency, or a cash advance, the transaction fee will cause the APR on the billing statement on which the transaction first appears to exceed your nominal APR.

**Transaction Fee for Balance Transfers:** You obtain a balance transfer if you obtain funds through a balance transfer check or transfer a balance without using a cash advance convenience check. We treat balance transfers as purchases unless otherwise provided in this Agreement. For each balance transfer we add an additional FINANCE CHARGE of 3% of the amount of the balance transfer, but not less than $5 or more than $75.

**Transaction Fee for Purchases Made in a Foreign Currency:** For each purchase made in a foreign currency we add an additional FINANCE CHARGE of 3% of the purchase amount after its conversion into U.S. dollars.

**Transaction Fee for Cash Advances:** You obtain a cash advance if you obtain funds through an automated teller machine (ATM), convenience check, home banking, or financial institution; make a wire transfer; obtain a money order, traveler's check, lottery ticket, casino chip, or similar item; or engage in a similar transaction. For each cash

4

5

advance we add an additional **FINANCE CHARGE** of 3% of the amount of the cash advance, but not less than $5.

## Other Fees

**Late Fee:** We add a late fee to the standard purchase balance for each billing period you fail to pay, by its due date, the Minimum Amount Due (less the Amount Over Credit Line shown on your billing statement). This fee is based on your account balance as of the payment due date. It is: $15 on balances up to $100; $29 on balances of $100 up to $250; and $39 on balances of $250 and over.

**Over-the-Credit-Line Fee:** We add a $39 fee to the standard purchase balance if your account balance exceeds your credit line at any time during the billing period. We add this fee even if transactions we authorize or periodic finance charges, fees, and other charges you incur are a reason the account balance exceeds your credit line. We add this fee even if the account balance falls below your credit line by the end of the billing period.

**Annual Membership Fee:** We add any applicable annual membership fee to the standard purchase balance. This fee is non-refundable unless you notify us to cancel your account within 30 days of the mailing or delivery date of the billing statement on which the fee is billed.

**Returned Payment Fee:** We add a $39 fee to the standard purchase balance if a payment check or similar instrument is not honored or is returned because it cannot be processed, or if an automatic debit is returned unpaid. We assess this fee the first time your check or payment is not honored, even if it is honored upon resubmission.

**Returned Convenience Check Fee:** We add a $39 fee to the standard advance balance if we decline to honor a convenience check. We may decline to honor these checks if, for example, the amount of the check would cause the balance to exceed the cash advance limit or credit line, if you default, if you did not comply with our instructions regarding the check, or if your account has been closed.

**Stop Payment on Convenience Check Fee:** We add a $39 fee to the standard advance balance if we honor your request to stop payment on a convenience check. To stop payment on a convenience check write us at P.O. Box 6500, Sioux Falls, South Dakota 57117, or call the Customer Service number on the billing statement. If you call, you must confirm the call in writing within 14 days. A written stop payment order remains in effect for 6 months unless renewed in writing.

**Balance Transfer Checks and Convenience Checks:** Each check must be in the form it was issued and used according

to any instructions we give. The checks must not be used to pay an amount owed us under this or another Card Agreement that you have with us. We do not certify these checks or return any such checks that have been paid.

## Information on Foreign Currency Conversion Procedures

If you make a transaction in a foreign currency, other than a cash advance made at a branch or ATM of one of our affiliates, MasterCard, Visa or American Express, depending on which card is used, converts the amount into U.S. dollars as follows:

- MasterCard complies with its foreign currency conversion procedures then in effect. MasterCard currently uses a conversion rate in effect one day prior to its transaction processing date. Such rate is either a wholesale market rate or the government-mandated rate.
- Visa complies with its foreign currency conversion procedures then in effect. Visa currently uses a conversion rate in effect on its applicable central processing date. Such rate is either a rate it selects from the range of rates available in wholesale currency markets, which may vary from the rate it receives, or the government-mandated rate.
- American Express complies with its foreign currency conversion procedures then in effect. Unless a particular rate is required by applicable law, the rate used by American Express shall be the highest interbank rate selected on the business day prior to the day on which the transaction is processed by American Express.

If a cash advance is made in a foreign currency at a branch or ATM of one of our affiliates, the amount is converted into U.S. dollars by our affiliate in accordance with its foreign currency conversion procedures then in effect. Our affiliate currently uses a conversion rate in effect on its applicable processing date. Such rate is either a mid-point market rate or the government-mandated rate.

The foreign currency conversion rate in effect on the applicable processing date for a transaction may differ from the rate in effect on the Sale or Post date on your billing statement for that transaction.

If a transaction is converted by a third party prior to such transaction being processed by MasterCard, Visa, or American Express, the foreign currency conversion rate for that transaction will be the rate selected by that third party.

## Payments

**Minimum Amount Due:** Each month you must pay at least the Minimum Amount Due by the payment due date. The

sooner you pay the New Balance, the less you will pay in periodic finance charges.

To calculate the Minimum Amount Due, we begin with any past due amount and add any amount in excess of your credit line. We then add the largest of the following:

* The New Balance on the billing statement if it is less than $20;
* $20 if the New Balance is at least $20;
* 1% of the New Balance (which calculation is rounded down to the nearest dollar) plus the amount of your billed finance charges and any applicable late fee; or
* 1.5% of the New Balance (which calculation is rounded down to the nearest dollar)

However, the Minimum Amount Due never exceeds the New Balance. In calculating the Minimum Amount Due, we may subtract from the New Balance certain fees added to your account during the billing period.

**Application of Payments.** We apply payments and credits to low APR balances before higher APR balances. That means your savings will be reduced if you make transactions that are subject to higher APRs.

**Payment Instructions.** Payments are credited in accordance with the payment instructions on the billing statement. You must pay us in U.S. dollars using a check, similar instrument, or automatic debit that is drawn on and honored by a bank in the U.S. Do not send cash. We can accept late or partial payments, and payments that reflect "paid in full" or other restrictive endorsements, without losing our rights. We reserve the right to accept payments made in foreign currency and instruments drawn on funds on deposit outside the U.S. If we do, we select the currency conversion rate at our discretion and credit your account in U.S. dollars after deducting any costs incurred in processing your payment, or we may bill you separately for such costs.

**Optional Pay by Phone Service.** You may request to make your payment by phone using our optional Pay by Phone Service. Each time you make such a request, you agree to pay us the amount shown in the Pay by Phone section on the back of the billing statement. Our representatives are trained to tell you this amount if you decide to use this optional Pay by Phone Service.

## Credit Reporting

We may report information about your account to credit reporting agencies. Late payments, missed payments, or other defaults on your account may appear on your credit report. If you request cards on your account for others, we may report account information in the names of those other

people as well. We may also obtain follow-up credit reports on you (for example, when we review your account for a credit line increase). If you wish to know which agencies we contacted, write us at the Customer Service address on the billing statement.

If you think we reported erroneous information to a credit reporting agency, write us at the Customer Service address on the billing statement. We will promptly investigate the matter and if we agree with you, we will contact each credit reporting agency to which we reported and request a correction. If, after our investigation, we disagree with you, we will tell you in writing or by telephone and tell you how to submit a statement to those agencies for inclusion in your credit report.

## Changes to this Agreement

We may change the rates, fees and terms of this Agreement at any time for any reason. These reasons may be based on information in your credit report, such as your failure to make payments to another creditor when due, amounts owed to other creditors, the number of credit accounts outstanding, or the number of credit inquiries. These reasons may also include competitive or market-related factors. Changing terms includes adding, replacing, or deleting provisions relating to your account and to the nature, extent, and enforcement of the rights and obligations you or we have relating to this Agreement. These changes are binding on you. However, if the change will cause a fee, rate or minimum payment to increase, we will mail you written notice at least 15 days before the beginning of the billing period in which the change becomes effective. If you do not agree to the change, you must notify us in writing within 25 days after the effective date of the change and pay us the total balance, either at once or under the terms of the unchanged Agreement. Unless we notify you otherwise, use of the card after the effective date of the change shall be deemed acceptance of the new terms, even if the 25 days have not expired.

## Default

You default under this Agreement if you fail to pay the Minimum Amount Due by its due date; exceed your credit line; pay by a check or similar instrument that is not honored or that we must return because it cannot be processed; pay by automatic debit that is returned unpaid; file for bankruptcy; or default under any other Card Agreement that you have with us. If you default, we may close your account and demand immediate payment of the total balance. If you gave us a security interest in a Certificate of Deposit, we may use the deposit amount to pay any amount you owe.

8

9

## Refusal of the Card, Closed Accounts, and Related Provisions

**Refusal of the Card:** We do not guarantee approval of transactions and are not liable for transactions that are not approved, either by us or by a third party, even if you have sufficient credit available. We may limit the number of transactions that may be approved in one day. If we detect unusual or suspicious activity, we may suspend your credit privileges until we can verify the activity.

**Preauthorized Charges:** If you default, if the card is lost or stolen, or we change your account for any reason, we may suspend automatic charges with third party vendors. If preauthorized charges are suspended, you are responsible for making direct payment for such charges until you contact the third party to reinstate the automatic charges.

**Lost or Stolen Cards, Account Numbers, or Convenience and Balance Transfer Checks:** If any card, account number, or check is lost or stolen or if you think someone used or may use them without permission, call us at the Customer Service number on the billing statement or the number obtained by calling toll-free or local Directory Assistance. We may require you to provide certain information in writing to help us find out what happened and to comply with our investigation. You must identify for us the charges that were not made by you, or someone authorized by you, and from which you received no benefit.

**Closing Your Account:** You may close your account by notifying us in writing or by calling toll-free at the Customer Service number shown on the billing statement or on the back of your credit card, but must still repay the total balance in accordance with this Agreement. We may close your account or suspend account privileges at any time for any reason without prior notice. We may also reissue a different card at any time. You must return any card to us upon request.

**Security Interest for Secured Accounts:** If your account is a secured account, you gave us a security interest in a Certificate of Deposit to secure repayment of your account. If you withdraw your funds from the Certificate of Deposit, we will close your account.

## ARBITRATION

*PLEASE READ THIS PROVISION OF THE AGREEMENT CAREFULLY.* IT PROVIDES THAT ANY DISPUTE MAY BE RESOLVED BY BINDING ARBITRATION. ARBITRATION REPLACES THE RIGHT TO GO TO COURT, INCLUDING THE RIGHT TO A JURY AND THE RIGHT TO PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING. IN ARBITRATION,

10

A DISPUTE IS RESOLVED BY AN ARBITRATOR INSTEAD OF A JUDGE OR JURY. ARBITRATION PROCEDURES ARE SIMPLER AND MORE LIMITED THAN COURT PROCEDURES.

*Agreement to Arbitrate:* Either you or we may, without the other's consent, elect mandatory, binding arbitration for any claim, dispute, or controversy between you and us (called "Claims").

### Claims Covered

**What Claims are subject to arbitration?** All Claims relating to your account, a prior related account, or our relationship are subject to arbitration, including Claims regarding the application, enforceability, or interpretation of this Agreement and this arbitration provision. All Claims are subject to arbitration, no matter what legal theory they are based on or what remedy (damages, or injunctive or declaratory relief) they seek. This includes Claims based on contract, tort (including intentional tort), fraud, agency, your or our negligence, statutory or regulatory provisions, or any other sources of law; Claims made as counterclaims, cross-claims, third-party claims, interpleaders or otherwise; and Claims made independently or with other claims. A party who initiates a proceeding in court may elect arbitration with respect to any Claim advanced in that proceeding by any other party. Claims and remedies sought as part of a class action, private attorney general or other representative action are subject to arbitration on an individual (non-class, non-representative) basis, and the arbitrator may award relief only on an individual (non-class, non-representative) basis.

**Whose Claims are subject to arbitration?** Not only ours and yours, but also Claims made by or against anyone connected with us or you or claiming through us or you, such as a co-applicant or authorized user of your account, an employee, agent, representative, affiliated company, predecessor or successor, heir, assignee, or trustee in bankruptcy.

**What time frame applies to Claims subject to arbitration?** Claims arising in the past, present, or future, including Claims arising before the opening of your account, are subject to arbitration.

**Broadest Interpretation.** Any questions about whether Claims are subject to arbitration shall be resolved by interpreting this arbitration provision in the broadest way the law will allow it to be enforced. This arbitration provision is governed by the Federal Arbitration Act (the "FAA").

**What about Claims filed in Small Claims Court?** Claims filed in a small claims court are not subject to arbitration, so long as the matter remains in such court and advances only an individual (non-class, non-representative) Claim.

11

## How Arbitration Works

**How does a party initiate arbitration?** The party filing an arbitration must choose one of the following two arbitration firms and follow its rules and procedures for initiating and pursuing an arbitration: American Arbitration Association or National Arbitration Forum. Any arbitration hearing that you attend will be held at a place chosen by the arbitration firm in the same city as the U.S. District Court closest to your then current billing address, or at some other place to which you and we agree in writing. You may obtain copies of the current rules of each of the arbitration firms and forms and instructions for initiating an arbitration by contacting them as follows:

American Arbitration Association
335 Madison Avenue, Floor 10
New York, NY 10017-4605
Web site: www.adr.org
National Arbitration Forum
P.O. Box 50191
Minneapolis, MN 55405
Web site: www.arbitration-forum.com

At any time you or we may ask an appropriate court to compel arbitration of Claims, or to stay the litigation of Claims pending arbitration, even if such Claims are part of a lawsuit, unless a trial has begun or a final judgment has been entered. Even if a party fails to exercise these rights at any particular time, or in connection with any particular Claims, that party can still require arbitration at a later time or in connection with any other Claims.

**What procedures and law are applicable in arbitration?** A single, neutral arbitrator will resolve Claims. The arbitrator will be either a lawyer with at least ten years experience or a retired or former judge, selected in accordance with the rules of the arbitration firm. The arbitration will follow procedures and rules of the arbitration firm in effect on the date the arbitration is filed unless those procedures and rules are inconsistent with this Agreement, in which case this Agreement will prevail. Those procedures and rules may limit the discovery available to you or us. The arbitrator will take reasonable steps to protect customer account information and other confidential information if requested to do so by you or us. The arbitrator will apply applicable substantive law consistent with the FAA and applicable statutes of limitations, will honor claims of privilege recognized at law, and will have the power to award to a party any damages or other relief provided for under applicable law. You or we may choose to have a hearing and be represented by counsel. The arbitrator will make any award in writing and, if requested by you or us,

will provide a brief statement of the reasons for the award. An award in arbitration shall determine the rights and obligations between the named parties only, and only in respect of the Claims in arbitration, and shall not have any bearing on the rights and obligations of any other person, or on the resolution of any other dispute.

**Who pays?** Whoever files the arbitration pays the initial filing fee. If we file, we pay; if you file, you pay, unless you get a fee waiver under the applicable rules of the arbitration firm. If you have paid the initial filing fee and you prevail, we will reimburse you for that fee. If there is a hearing, we will pay any fees of the arbitrator and arbitration firm for the first day of that hearing. All other fees will be allocated as provided by the rules of the arbitration firm and applicable law. However, we will advance or reimburse your fees if the arbitration firm or arbitrator determines there is good reason for requiring us to do so, or if you ask us and we determine there is good reason for doing so. Each party will bear the expense of that party's attorneys, experts, and witnesses, and other expenses, regardless of which party prevails, but a party may recover any or all expenses from another party if the arbitrator, applying applicable law, so determines.

**Who can be a party?** Claims must be brought in the name of an individual person or entity and must proceed on an individual (non-class, non-representative) basis. The arbitrator will not award relief for or against anyone who is not a party. If you or we require arbitration of a Claim, neither you, we, nor any other person may pursue the Claim in arbitration as a class action, private attorney general action or other representative action, nor may such Claim be pursued on your or our behalf in any litigation in any court. Claims, including assigned Claims, of two or more persons may not be joined or consolidated in the same arbitration. However, applicants, co-applicants, authorized users on a single account and/or related accounts, or corporate affiliates are here considered as one person.

**When is an arbitration award final?** The arbitrator's award is final and binding on the parties unless a party appeals it in writing to the arbitration firm within fifteen days of notice of the award. The appeal must request a new arbitration before a panel of three neutral arbitrators designated by the same arbitration firm. The panel will consider all factual and legal issues anew, follow the same rules that apply to a proceeding using a single arbitrator, and make decisions based on the vote of the majority. Costs will be allocated in the same way they are allocated for arbitration before a single arbitrator. An award by a panel is final and binding on the parties after fifteen days has passed. A final and binding award is subject

to judicial review and enforcement as provided by the FAA or other applicable law.

### Survival and Severability of Terms

This arbitration provision shall survive: (i) termination or changes in the Agreement, the account, or the relationship between you and us concerning the account; (ii) the bankruptcy of any party; and (iii) any transfer, sale or assignment of your account, or any amounts owed on your account, to any other person or entity. If any portion of this arbitration provision is deemed invalid or unenforceable, the entire arbitration provision shall not remain in force. No portion of this arbitration provision may be amended, severed or waived absent a written agreement between you and us.

### Applicable Law and Enforcing our Rights

**Applicable Law:** The terms and enforcement of this Agreement shall be governed by federal law and the law of South Dakota, where we are located.

**Enforcing this Agreement:** We can delay in enforcing or fail to enforce any of our rights under this Agreement without losing them.

**Collection Costs:** If we refer collection of your account to a lawyer who is not our salaried employee, you are liable for any reasonable attorney's fees we incur, plus the costs and expenses of any legal action, to the extent permitted by law.

**Assignment:** We may assign any or all of our rights and obligations under this Agreement to a third party.

### For Further Information

Call the toll-free Customer Service telephone number shown on the billing statement or on the back of your card. You can also call local or toll-free Directory Assistance to get our telephone number.

Ken Stork
President & CEO

Citibank (South Dakota), N.A.
P.O. Box 6000
Sioux Falls, SD 57117

© 2006 Citibank (South Dakota), N.A.

### What To Do if There's An Error in Your Bill

**Your Billing Rights, Keep This Notice For Future Use.** This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

**Notify Us in Case of Errors or Questions About Your Bill.** If you think your billing statement is wrong, or if you need more information about a transaction on your billing statement, write to us (on a separate sheet) as soon as possible at the address provided in the Billing Rights Summary portion on the back of your statement. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:

- Your name and account number.
- The dollar amount of the suspected error.
- Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.
- Please sign your letter.

If you authorized us to pay your credit card bill automatically from your savings or checking account, you can stop the payment on any amount you think is wrong. To stop the payment you must tell us at least three business days before the automatic payment is scheduled to occur.

**Your Rights and Our Responsibilities After We Receive Your Written Notice.** We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we must either correct the error or explain why we believe your billing statement was correct. After we receive your letter, we cannot try to collect any amount you question, or report your account as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your credit line. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your balance that are not in question.

If we find that we made a mistake on your billing statement, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date it is due.

14

15

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within 10 days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And, we must tell you the name and address of anyone to whom we reported your account information. We must tell anyone we report you to that the matter has been settled between us when it is finally settled.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your billing statement was correct.

### Special Rule for Credit Card Purchases.

If you have a problem with the quality of property or services that you purchased with a credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the property or services. There are two limitations on this right:

* You must have made the purchase in your home state or, if not within your home state, within 100 miles of your current address; and
* The purchase price must have been more than $50.

These limitations do not apply if we own or operate the merchant, or if we mailed you the advertisement for the property or services.

© 2006 Citibank (South Dakota), N.A.

5049170U      Pr. 07/06   109060                    06/06

# EXHIBIT "C"

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
FIRST MUNICIPAL DISTRICT

| | | |
|---|---|---|
| RESURGENCE FINANCIAL, LLC, an Illinois Limited Liability Company | ) | Case No. 08M1 137539 |
| | ) | |
| Plaintiff | ) | |
| v. | ) | |
| CHEYENNE FELTON | ) | |
| | ) | |
| Defendant(s). | ) | |
| | ) | |
| | ) | |
| | ) | |

### AFFIDAVIT OF CLAIM

I, Eileen M. Mahon, an employee of Resurgence Financial, LLC, being first duly sworn upon my oath depose and state as follows:

1.     I am over the age of 21, under no legal disability, and if called and sworn as a witness in this cause, would testify that I have personal knowledge of the facts set forth in this petition.

2.     I am employed by Resurgence Financial, LLC, an Illinois Limited Liability Company ("Resurgence").

3.     Resurgence is proceeding in this matter on an assignment from UNIFUND.

4.     I am familiar with the account OF CHEYENNE FELTON with Resurgence.

5.     I am familiar with the computer records of Resurgence and how to search the records of Resurgence to determine the status of accounts with our company.

6.     I have the authority to review the computer records of Resurgence.

7.     I have reviewed the records of Resurgence, which reflect that CHEYENNE FELTON was issued a credit card by CITIBANK SOUTH DAKOTA NA / CITI DIAMOND PREFERRED REWARDS, with an account number of ████████5220 and that the issuer, CITIBANK SOUTH DAKOTA NA / CITI DIAMOND PREFERRED REWARDS charged off said account on June 15, 2006, as a result of Defendant defaulting in making payments pursuant to the Cardmember Agreement.

8.     I have reviewed the computer records of Resurgence. There is a balance due to Resurgence on this account in the amount of $1,298.04 and Resurgence has not received payment.

```
┌─────────────────────────────────┐
│        "OFFICIAL SEAL"          │
│         TRESSA I PECK           │
│   Notary Public, State of Illinois │
│  My Commission Expires 11/4/2009 │
└─────────────────────────────────┘
```

FURTHER, THE AFFIANT SAYETH NAUGHT.

_Eileen M. Mahon_
RESURGENCE FINANCIAL, LLC
EILEEN M. MAHON

SUBSCRIBED AND SWORN TO
before me this 16 day of April , 20 08 .

_Tressa I Peck_
NOTARY PUBLIC

R0060819

UNITED STATES OF AMERICA

STATE OF ILLINOIS

COUNTY OF COOK

FIRST MUNICIPAL DISTRICT

| RESURGENCE FINANCIAL, LLC, an Illinois Limited Liability Company, | CASE NUMBER | |
|---|---|---|
| Plaintiff | _____ | |
| v. | | |
| CHEYENNE FELTON | | FILE STAMP HERE |
| Defendant(s) | | |

### AFFIDAVIT TO MILITARY SERVICE

Resurgence Financial LLC, by its duly authorized agent, being first duly sworn upon my oath depose and states:

With respect to (each) defendant, CHEYENNE FELTON, ███████████ ███████████:

☐    the Defendant is

☒    the Defendant is not

☐    I am unable to determine whether the Defendant is

in the military service of the United States of America.

This affidavit is based on these facts:  I searched on the Department of Defense website:  www.dmdc.osd.mil/scra/owa/home and the report indicated that the Defendant (is) (is not) on active military duty.

"OFFICIAL SEAL"
TRESSA I PECK
Notary Public, State of Illinois
My Commission Expires 11/4/2009

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the above signed certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on the information and belief and as to such matters the above signed certifies as aforesaid that s/he believes the same to be true.

Sworn and Subscribed before me this 16 day of _____, 20 08

NOTARY PUBLIC

EILEEN M. MAHON

RESURGENCE FINANCIAL, LLC
Legal Department
4100 Commercial Avenue
Northbrook, IL 60062
847/656-2200
#41776

# APPENDIX D

1210V5

**Time of Request:** Tuesday, June 24, 2008  12:55:16 EST
**Client ID/Project Name:** 21581
**Number of Lines:** 6866
**Job Number:**    1821:99804109

Research Information

**Service:**   Terms and Connectors Search
**Print Request:** Selected Document(s): 1-1000
**Source:** IL Public Records, Combined
**Search Terms:** resurgence and not ("district court" or garnishment or
foreclosure) and date geq (01/01/2008)

**Send to:**  MILLER, CASSANDRA
          EDELMAN COMBS & LATTURNER
          120 S LA SALLE ST FL 18
          CHICAGO, IL 60603-3593

1. ABUSHANAB,ANNA S, 07M1164541, CIVIL JUDGMENT, 03/10/2008, IL JUDGMENTS AND LIENS
RESURGENCE FINANCI

2. ADAMS,TERRI L, 07M1148913, CIVIL JUDGMENT, 01/07/2008, IL JUDGMENTS AND LIENS
RESURGENCE FINANCI

3. ADAMS; TERRI L, 07M1 0148913, 1/7/2008, JUDGMENT, COOK COUNTY, ILLINOIS - 1ST MUNICIPAL
DISTRICT
RESURGENCE FINANCIAL LLC

4. AGUILAR,CESAR A, 07M1164526, CIVIL JUDGMENT, 01/22/2008, IL JUDGMENTS AND LIENS
RESURGENCE FINANCI

5. AGUILAR; CESAR A, 07M1 0164526, 1/22/2008, JUDGMENT, COOK COUNTY, ILLINOIS - 1ST MUNICIPAL
DISTRICT
RESURGENCE FINANCIAL

6. AHMAD,SAMIRA A, 07M1210041, CIVIL JUDGMENT, 01/28/2008, IL JUDGMENTS AND LIENS
RESURGENCE FINANCI

7. AHMAD; SAMIRA A, et al., 07M1 0210041, 1/28/2008, JUDGMENT, COOK COUNTY, ILLINOIS - 1ST
MUNICIPAL DISTRICT
RESURGENCE FINANCIAL

8. AHMED; ALI, 07M1 0205987, 1/22/2008, JUDGMENT, COOK COUNTY, ILLINOIS - 1ST MUNICIPAL
DISTRICT
RESURGENCE FINANCIAL

9. AKHTAR; MALIK IQBAL, 07M1 0206369, 4/28/2008, JUDGMENT, COOK COUNTY, ILLINOIS - 1ST
MUNICIPAL DISTRICT
RESURGENCE FINANCIAL

10. ALBA; SILVIA A, 08M1 0121075, 4/28/2008, JUDGMENT, COOK COUNTY, ILLINOIS - 1ST MUNICIPAL
DISTRICT
RESURGENCE FINANCIAL
RESURGENCE FINANCIAL

11. ALRAMAHI,AHMED M, 05M1108135, CIVIL JUDGMENT, 02/04/2008, IL JUDGMENTS AND LIENS
RESURGENCE FINANCI

12. AMBROSE,PATRICK L, 06M1126536, CIVIL JUDGMENT, 01/28/2008, IL JUDGMENTS AND LIENS
RESURGENCE FINANCI

13. AMBROSE; PATRICK L, et al., 06M1 0126536, 1/28/2008, JUDGMENT, COOK COUNTY, ILLINOIS - 1ST
MUNICIPAL DISTRICT
RESURGENCE FINANCIAL
RESURGENCE FINANCIAL

14. AMBROSE; IRIS M, 06M1 0137823, 3/31/2008, JUDGMENT, COOK COUNTY, ILLINOIS - 1ST MUNICIPAL
DISTRICT
RESURGENCE FINANCIAL

15. AMBROSE,IRIS M, 06M1137823, CIVIL JUDGMENT, 03/31/2008, IL JUDGMENTS AND LIENS
RESURGENCE FINANCI

16. ARMATO,ANGELO, 08SC44, SMALL CLAIMS JUDGMENT, 04/16/2008, IL JUDGMENTS AND LIENS
RESURGENCE FINANCIAL L

17. ASHFAQ,MIRZA M, 07M2002160, CIVIL JUDGMENT, 02/20/2008, IL JUDGMENTS AND LIENS
RESURGENCE FINANCI

18. ASHFAQ;MIRZA M, et al., 07M2 0002160, 2/20/2008, JUDGMENT, COOK COUNTY, ILLINOIS - 2ND
MUNICIPAL DISTRICT
RESURGENCE FINANCIAL

19. ASHLEY,TJUNAN A, 06M1108022, CIVIL JUDGMENT, 02/11/2008, IL JUDGMENTS AND LIENS
RESURGENCE FINANCI

20. ASHLEY; TJUNAN A, 06M1 0108022, 2/11/2008, JUDGMENT, COOK COUNTY, ILLINOIS - 1ST
MUNICIPAL DISTRICT
RESURGENCE FINANCIAL LLC

21. ASHRAF,MOHD, 07M2001637, CIVIL JUDGMENT, 05/06/2008, IL JUDGMENTS AND LIENS
RESURGENCE FINAN

22. ASHRAF;SARKER M, et al., 08LM 0000338, 5/5/2008, JUDGMENT, CHAMPAIGN COUNTY, ILLINOIS
RESURGENCE FINANCIAL

23. BACHYPIN,ISAIAS (aka), 04SC2032, SMALL CLAIMS JUDGMENT RELEASE, 05/20/2004, IL JUDGMENTS
AND LIENS
RESURGENCE FINANCIAL LLC
01/16/2008

24. BAGLEY,PHILLIP Jr, 07M1206793, CIVIL JUDGMENT, 01/22/2008, IL JUDGMENTS AND LIENS
RESURGENCE FINANCI

25. BAGLEY; PHILLIP G, 07M1 0206793, 1/22/2008, JUDGMENT, COOK COUNTY, ILLINOIS - 1ST
MUNICIPAL DISTRICT
RESURGENCE FINANCIAL
RESURGENCE FINANCIAL

26. BAIG,MIRZA, 07M2002160, CIVIL JUDGMENT, 02/20/2008, IL JUDGMENTS AND LIENS
RESURGENCE FINANCI

27. BAIGASHFAQ,MIRZA M, 07M2002160, CIVIL JUDGMENT, 02/20/2008, IL JUDGMENTS AND LIENS
RESURGENCE FINANCI

28. BAILEY; ANGELA MICHELLE, 07M2 0002878, 5/6/2008, JUDGMENT, COOK COUNTY, ILLINOIS - 2ND
MUNICIPAL DISTRICT
RESURGENCE FINANCIAL LLC

29. BAILEY,ANGELA M, 07M2002878, CIVIL JUDGMENT, 05/06/2008, IL JUDGMENTS AND LIENS
RESURGENCE FINANCI

30. BAILEY,CAROLYN, 07M2000667, CIVIL JUDGMENT, 01/15/2008, IL JUDGMENTS AND LIENS
RESURGENCE FINACIA

31. BAILEY;CAROLYN E, 07M2 0000667, 1/15/2008, JUDGMENT, COOK COUNTY, ILLINOIS - 2ND
MUNICIPAL DISTRICT
RESURGENCE FINANCIAL LLC

32. BAKER,EDWARD E, 07M1186623, CIVIL JUDGMENT, 01/14/2008, IL JUDGMENTS AND LIENS
RESURGENCE FINANCI

33. BAKER; EDWARD E, 07M1 0186623, 1/14/2008, JUDGMENT, COOK COUNTY, ILLINOIS - 1ST
MUNICIPAL DISTRICT
RESURGENCE FINANCIAL

34. BAKER; HEATHER E, 07M1 0190183, 3/24/2008, JUDGMENT, COOK COUNTY, ILLINOIS - 1ST
MUNICIPAL DISTRICT
RESURGENCE FINANCIAL LLC

35. BAKER,HEATHER E, 07M1190183, CIVIL JUDGMENT, 03/24/2008, IL JUDGMENTS AND LIENS
RESURGENCE FINANCI

36. BANKS; JOHN H, 06M1 0141321, 4/21/2008, JUDGMENT, COOK COUNTY, ILLINOIS - 1ST MUNICIPAL
DISTRICT
RESURGENCE FINANCIAL LLC

37. BANKS,JOHN H, 06M1141321, CIVIL JUDGMENT, 04/21/2008, IL JUDGMENTS AND LIENS
RESURGENCE FINANCI

38. BARKER,TAMMY K, 08SC1025, SMALL CLAIMS JUDGMENT, 05/06/2008, IL JUDGMENTS AND LIENS
RESURGENCE FINANCIAL L

39. BARNES; WELDEN J, et al., 05M1 0155405, 6/9/2008, JUDGMENT, COOK COUNTY, ILLINOIS - 1ST
MUNICIPAL DISTRICT
RESURGENCE FINANCIAL
RESURGENCE FINANCIAL

40. BELL,TONI M, 06M1137832, CIVIL JUDGMENT RELEASE, 07/10/2006, IL JUDGMENTS AND LIENS
RESURGENCE FINANCI
04/01/2008

41. BENNETT,BRUCE E, 07M1172693, CIVIL JUDGMENT, 01/07/2008, IL JUDGMENTS AND LIENS
RESURGENCE FINANCI

42. BENNETT; BRUCE E, 07M1 0172693, 1/7/2008, JUDGMENT, COOK COUNTY, ILLINOIS - 1ST MUNICIPAL
DISTRICT
RESURGENCE FINANCIAL LLC

43. BENSON; CECILIA, 07M1 0210043, 5/12/2008, JUDGMENT, COOK COUNTY, ILLINOIS - 1ST MUNICIPAL
DISTRICT
RESURGENCE FINANCIAL LLC

44. BERGEMANN,EUGENE P, 07M1100210, CIVIL JUDGMENT, 01/07/2008, IL JUDGMENTS AND LIENS
RESURGENCE FINANCI

45. BERGEMANN; EUGENE P, 07M1 0100210, 1/7/2008, JUDGMENT, COOK COUNTY, ILLINOIS - 1ST
MUNICIPAL DISTRICT
RESURGENCE FINANCIAL LLC

46. BHOLEN,JEREMY C, 06M1201991, CIVIL JUDGMENT RELEASE, 07/23/2007, IL JUDGMENTS AND LIENS
RESURGENCE FINANCI
03/27/2008

47. BIANCHINI; KAREN R, 06M1 0171255, 1/14/2008, VACATED JUDGMENT, COOK COUNTY, ILLINOIS -
1ST MUNICIPAL DISTRICT
RESURGENCE FINANCIAL
RESURGENCE FINANCIAL

48. BIELAS;ANTONI M, 07AR 0001997, 1/17/2008, JUDGMENT, DUPAGE COUNTY, ILLINOIS
RESURGENCE FINANCIAL LLC
RESURGENCE FINANCIAL LLC LEGAL  ...

49. BLACK,BILLIE J, 06M1194316, CIVIL JUDGMENT, 02/11/2008, IL JUDGMENTS AND LIENS
RESURGENCE FINANCI

50. BLACK; BILLIE J, et al., 06M1 0194316, 2/11/2008, JUDGMENT, COOK COUNTY, ILLINOIS - 1ST
MUNICIPAL DISTRICT
RESURGENCE FINANCIAL LLC

51. BOCKHAUS;LISA M, 08SC 0001545, 5/28/2008, JUDGMENT, MCHENRY COUNTY, ILLINOIS
RESURGENCE FINANCIAL LLC
RESURGENCE FINANCIAL - LEGAL DEPT

52. BONDS; MARK A, 07M1 0170945, 5/5/2008, JUDGMENT, COOK COUNTY, ILLINOIS - 1ST MUNICIPAL
DISTRICT
RESURGENCE FINANCIAL
RESURGENCE FINANCIAL

53. BOOKER,LINDA M, 06M1188207, CIVIL JUDGMENT RELEASE, 04/30/2007, IL JUDGMENTS AND LIENS
RESURGENCE FINANCI
02/13/2008

54. BOONE,CHRISTINE, 06M1139961, CIVIL JUDGMENT, 01/28/2008, IL JUDGMENTS AND LIENS
RESURGENCE FINANCI

55. BORGES; ANTONIO G, et al., 07M1 0210042, 4/21/2008, JUDGMENT, COOK COUNTY, ILLINOIS - 1ST
MUNICIPAL DISTRICT
RESURGENCE FINANCIAL
RESURGENCE FINANCIAL

56. BOUDROS; SUE N, 07M1 0210044, 5/19/2008, JUDGMENT, COOK COUNTY, ILLINOIS - 1ST MUNICIPAL
DISTRICT
RESURGENCE FINANCIAL LLC

57. BRANDIMORE;SCOTT A, 07AR 0002002, 1/17/2008, JUDGMENT, DUPAGE COUNTY, ILLINOIS
RESURGENCE FINANCIAL LLC
RESURGENCE FINANCIAL LLC LEGAL  ...

58. BRITO,HECTOR, 06M1186739, CIVIL JUDGMENT RELEASE, 05/21/2007, IL JUDGMENTS AND LIENS
RESURGENCE FINANCI
04/16/2008

59. BROWN; ALVIN A, 06M1 0140443, 3/24/2008, JUDGMENT, COOK COUNTY, ILLINOIS - 1ST MUNICIPAL
DISTRICT
RESURGENCE FINANCIAL LLC

60. BROWN,ALVIN A, 06M1140443, CIVIL JUDGMENT, 03/24/2008, IL JUDGMENTS AND LIENS
RESURGENCE FINANCI

61. BROWN,JAMES P, 06M1191361, CIVIL JUDGMENT, 01/28/2008, IL JUDGMENTS AND LIENS
RESURGENCE FINANCI

62. BROWN; LIZA M, 06M1 0150195, 4/7/2008, JUDGMENT, COOK COUNTY, ILLINOIS - 1ST MUNICIPAL
DISTRICT
RESURGENCE FINANCIAL LLC

RESURGENCE FINANCIAL

1390. WILLIAMS; TYRONE, 02M2 0001534, 3/18/2008, JUDGMENT, COOK COUNTY, ILLINOIS - 2ND MUNICIPAL DISTRICT
RESURGENCE FINANCIAL LLC

1391. WILLIAMS,TYRONE, 02M2001534, CIVIL JUDGMENT, 03/18/2008, IL JUDGMENTS AND LIENS
RESURGENCE FINANCI

1392. WILLIAMS,MARISSA G, 07M1155103, CIVIL JUDGMENT, 05/05/2008, IL JUDGMENTS AND LIENS
RESURGENCE FINANCI

1393. WILSON,ANTHONY D, 05M1140929, CIVIL JUDGMENT RELEASE, 07/10/2006, IL JUDGMENTS AND LIENS
RESURGENCE FINANCI
04/16/2008

1394. WILSON,CHARLES, 05M1178458, CIVIL JUDGMENT RELEASE, 07/17/2006, IL JUDGMENTS AND LIENS
RESURGENCE FINANCI
04/16/2008

1395. WILSON; REMARDO EUGENE, 07M1 0209095, 5/19/2008, JUDGMENT, COOK COUNTY, ILLINOIS - 1ST MUNICIPAL DISTRICT
RESURGENCE FINANCIAL LLC

1396. WILSON;YOLANDA M, 08SC 0003311, 6/4/2008, JUDGMENT, LAKE COUNTY, ILLINOIS
RESURGENCE FINANCIAL LLC

1397. WINSLOW; ANNE G, et al., 07M1 0206791, 6/2/2008, JUDGMENT, COOK COUNTY, ILLINOIS - 1ST MUNICIPAL DISTRICT
RESURGENCE FINANCIAL
RESURGENCE FINANCIAL

1398. WILLIAM; MICHAEL K, 07M1 0189790, 6/5/2008, JUDGMENT, COOK COUNTY, ILLINOIS - 1ST MUNICIPAL DISTRICT
RESURGENCE FINANCIAL LLC

1399. WOJTANEK;LENORE, et al., 07SC 0000170, 4/16/2008, JUDGMENT, LAKE COUNTY, ILLINOIS
RESURGENCE FINANCIAL LLC

1400. WOODS,EDDIE L Jr, 07M1206357, CIVIL JUDGMENT, 02/04/2008, IL JUDGMENTS AND LIENS
RESURGENCE FINANCI

1401. WOODS; EDDIE L, 07M1 0206357, 2/4/2008, JUDGMENT, COOK COUNTY, ILLINOIS - 1ST MUNICIPAL DISTRICT
RESURGENCE FINANCIAL LLC

1402. WRIGHT,CHARLES A, 06M1101956, CIVIL JUDGMENT RELEASE, 04/25/2006, IL JUDGMENTS AND LIENS
RESURGENCE FINANCI
03/31/2008

1403. YATES; AARON D, 08M1 0122568, 5/5/2008, JUDGMENT, COOK COUNTY, ILLINOIS - 1ST MUNICIPAL DISTRICT
RESURGENCE FINANCIAL
RESURGENCE FINANCIAL

1404. YORK,BRENDA L, 2006SC385, SMALL CLAIMS JUDGMENT RELEASE, 06/28/2006, IL JUDGMENTS AND LIENS
RESURGENCE FINANCIAL LLC
04/11/2008

1405. YORK,DUSTIN, 2005SC002853, SMALL CLAIMS JUDGMENT RELEASE, 11/08/2005, IL JUDGMENTS AND LIENS
RESURGENCE FINANCIAL LLC
04/07/2008

1406. YOUMARAN; NADA, et al., 06M1 0201989, 5/5/2008, JUDGMENT, COOK COUNTY, ILLINOIS - 1ST MUNICIPAL DISTRICT
RESURGENCE FINANCIAL
RESURGENCE FINANCIAL

1407. YOUNG,PAUL J, 08SC1775, SMALL CLAIMS JUDGMENT, 05/29/2008, IL JUDGMENTS AND LIENS
RESURGENCE FINANCIAL

1408. ZAMUDIO; VITA, et al., 06M1 0141354, 3/24/2008, JUDGMENT, COOK COUNTY, ILLINOIS - 1ST MUNICIPAL DISTRICT
RESURGENCE FINANCIAL LLC

1409. ZAMUDIO,VITA, 06M1141354, CIVIL JUDGMENT, 03/24/2008, IL JUDGMENTS AND LIENS
RESURGENCE FINANCI

1410. ZARA; BARBARA J, et al., 07M1 0253734, 3/24/2008, JUDGMENT, COOK COUNTY, ILLINOIS - 1ST MUNICIPAL DISTRICT
RESURGENCE FINANCIAL LLC

1411. ZENBABA,MERGITU G, 06M1174705, CIVIL JUDGMENT, 01/22/2008, IL JUDGMENTS AND LIENS
RESURGENCE FINANCI

1412. ZENBABA; MERGITU G, 06M1 0174705, 1/22/2008, JUDGMENT, COOK COUNTY, ILLINOIS - 1ST MUNICIPAL DISTRICT
RESURGENCE FINANCIAL
RESURGENCE FINANCIAL

1413. ZIARKO,LINDA M, 05M1159492, CIVIL JUDGMENT, 01/28/2008, IL JUDGMENTS AND LIENS
RESURGENCE FINANCI

1414. ZIARKO; LINDA M, et al., 05M1 0159492, 1/28/2008, JUDGMENT, COOK COUNTY, ILLINOIS - 1ST MUNICIPAL DISTRICT
RESURGENCE FINANCIAL

1415. ZIARKO,LINDA M, 05M1159492, CIVIL JUDGMENT RELEASE, 01/28/2008, IL JUDGMENTS AND LIENS
RESURGENCE FINANCI
04/10/2008

1416. ZILLIGEN; MICHAEL K, 06M1 0142497, 3/31/2008, JUDGMENT, COOK COUNTY, ILLINOIS - 1ST MUNICIPAL DISTRICT
RESURGENCE FINANCIAL

1417. ZILLIGEN,MICHAEL K, 06M1142497, CIVIL JUDGMENT, 03/31/2008, IL JUDGMENTS AND LIENS
RESURGENCE FINANCI

1418. ZIOGAS,BENEDICT, 2006SC2732, SMALL CLAIMS JUDGMENT, 02/08/2008, IL JUDGMENTS AND LIENS

RESURGENCE FINANCIAL LLC

1419. ZIOGAS;BENEDICT, 06SC 0002732, 2/8/2008, JUDGMENT, SANGAMON COUNTY, ILLINOIS
RESURGENCE FINANCAIL LLC

# APPENDIX E

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MIRIAM S. MARTINEZ, | ) | |
| individually and on behalf of the classes | ) | |
| defined herein, | ) | 08 C 3519 |
| | ) | |
| Plaintiff, | ) | Judge Pallmeyer |
| | ) | |
| vs. | ) | Magistrate Judge Mason |
| | ) | |
| RESURGENCE FINANCIAL, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF DANIEL A. EDELMAN

Daniel A. Edelman declares under penalty of perjury, as provided for by 28 U.S.C. §1746, that the following statements are true:

**1.** Edelman, Combs, Latturner & Goodwin, LLC, has 5 principals, Daniel A. Edelman, Cathleen M. Combs, James O. Latturner, Tara L. Goodwin, and Michelle R. Teggelaar and 9 associates.

**2.** **Daniel A. Edelman** is a 1976 graduate of the University of Chicago Law School. From 1976 to 1981 he was an associate at the Chicago office of Kirkland & Ellis with heavy involvement in the defense of consumer class action litigation (such as the General Motors Engine Interchange cases). In 1981 he became an associate at Reuben & Proctor, a medium-sized firm formed by some former Kirkland & Ellis lawyers, and was made a partner there in 1982. From the end of 1985 he has been in private practice in downtown Chicago. Virtually all of his practice involves litigation on behalf of consumers, mostly through class actions. He is the author of Chapter 6, "Predatory Lending and Potential Class Actions," in Real Estate Litigation (Ill. Inst. For Cont. Legal Educ. 2008), Chapter 4-1, "Truth in Lending Act," in Illinois Causes of Action (Ill. Inst. For Cont. Legal Educ. 2008), ch. 6 of Illinois Mortgage Foreclosure Practice (Ill. Inst. For Cont. Legal Educ.2003); Predatory Lending and Potential Class Actions, ch. 5 of Real Estate Litigation (Ill. Inst. For Cont. Legal Educ.2004); co-author of Rosmarin & Edelman, Consumer Class Action Manual (2d-4th editions, National Consumer Law Center 1990, 1995 and 1999); author of Payday Loans: Big Interest Rates and Little Regulation, 11 Loy.Consumer L.Rptr. 174 (1999); author of Consumer Fraud and Insurance Claims, in Bad Faith and Extracontractual Damage Claims in Insurance Litigation, Chicago Bar Ass'n 1992; co-author of Chapter 8, "Fair Debt Collection Practices Act," Ohio Consumer Law (1995 ed.); co-author of Fair Debt Collection: The Need for Private Enforcement, 7 Loy.Consumer L.Rptr. 89 (1995); author of An Overview of The Fair Debt Collection Practices Act, in Financial Services

1

Litigation, Practicing Law Institute (1999); co-author of <u>Residential Mortgage Litigation</u>, in Financial Services Litigation, Practicing Law Institute (1996); author of <u>Automobile Leasing: Problems and Solutions</u>, 7 Loy.Consumer L.Rptr. 14 (1994); author of <u>Current Trends in Residential Mortgage Litigation</u>, 12 Rev. of Banking & Financial Services 71 (April 24, 1996); author of <u>Applicability of Illinois Consumer Fraud Act in Favor of Out-of-State Consumers</u>, 8 Loy.Consumer L.Rptr. 27 (1996); co-author of <u>Illinois Consumer Law</u> (Chicago Bar Ass'n 1996); co-author of D. Edelman and M. A. Weinberg, <u>Attorney Liability Under the Fair Debt Collection Practices Act</u> (Chicago Bar Ass'n 1996); author of <u>The Fair Debt Collection Practices Act:  Recent Developments</u>, 8 Loy.Consumer L. Rptr. 303 (1996); author of Second Mortgage Frauds, Nat'l Consumer Rights Litigation Conference 67 (Oct. 19-20, 1992); and author of Compulsory Arbitration of Consumer Disputes, Nat'l Consumer Rights Litigation Conference 54, 67 (1994).   He is a member of the Illinois bar and admitted to practice in the following courts: United States Supreme Court, Seventh Circuit Court of Appeals, First Circuit Court of Appeals, Second Circuit Court of Appeals, Third Circuit Court of Appeals, Fifth Circuit Court of Appeals, Eighth Circuit Court of Appeals, Ninth Circuit Court of Appeals, Tenth Circuit Court of Appeals, Eleventh Circuit Court of Appeals, United States District Courts for the Northern and Southern Districts of Indiana, United States District Courts for the Northern, Central, and Southern Districts of Illinois, United States District Court for the District of Arizona, United States District Court for the District of Connecticut, and the Supreme Court of Illinois.  He is a member of the Northern District of Illinois trial bar.

       **3.**    **Cathleen M. Combs** is a 1976 graduate of Loyola University Law School.  She formerly supervised the Northwest office of the Legal Assistance Foundation of Chicago, where she was lead or co-counsel in class actions in the areas of unemployment compensation, prison law, social security law, and consumer law.  She joined what is now Edelman, Combs, Latturner & Goodwin, LLC in early 1991.  Decisions in which she was involved prior to joining the firm include:  <u>Johnson v. Heckler</u>, 607 F.Supp. 875 (N.D.Ill. 1984), and 100 F.R.D. 70 (N.D. Ill. 1983); <u>Sanders v. Shephard</u>, 185 Ill.App.3d 719, 541 N.E.2d 1150 (1st Dist. 1989); <u>Maller v. Cohen</u>, 176 Ill.App.3d 987, 531 N.E.2d 1029 (1st Dist. 1988); <u>Wright v. Department of Labor</u>, 166 Ill.App.3d 438, 519 N.E.2d 1054 (1st Dist. 1988); <u>Barron v. Ward</u>, 165 Ill.App.3d 653, 517 N.E.2d 591 (1st Dist. 1987); <u>City of Chicago v. Leviton</u>, 137 Ill.App.3d 126, 484 N.E.2d 438 (1st Dist. 1985); <u>Jude v. Morrissey</u>, 117 Ill.App.3d 782, 454 N.E.2d 24 (1st Dist. 1983).  She is a member of the Northern District of Illinois trial bar.

       **4.**    **James O. Latturner** is a 1962 graduate of the University of Chicago Law School.  Until 1969, he was an associate and then a partner at the Chicago law firm of Berchem, Schwanes & Thuma.  From 1969 to 1995 he was Deputy Director of the Legal Assistance Foundation of Chicago, where he specialized in consumer law, including acting as lead counsel in over 30 class actions.  His publications include Chapter 8 ("Defendants") in <u>Federal Practice Manual for Legal Services Attorneys</u> (M. Masinter, Ed., National Legal Aid and Defender Association 1989); <u>Governmental Tort Immunity in Illinois</u>, 55 Ill.B.J. 29 (1966); <u>Illinois Should Explicitly Adopt the Per Se Rule for Consumer Fraud Act Violations</u>, 2 Loy.Consumer L.Rep. 64 (1990), and <u>Illinois Consumer Law</u> (Chicago Bar Ass'n 1996).  He has taught in a nationwide series of 18 Federal Practice courses sponsored by the Legal Services Corporation, each lasting

four days and designed for attorneys with federal litigation experience. He has argued some 30 appeals, including two cases in the United States Supreme Court and two in the Illinois Supreme Court. Mr. Latturner was involved in many of the significant decisions establishing the rights of Illinois consumers. He is a member of the Northern District of Illinois trial bar.

5.     **Tara L. Goodwin** is a graduate of the University of Chicago (B.A., with general honors, 1988)and Illinois Institute of Technology, Chicago-Kent College of Law (J.D., with high honors,1991). She has been with the firm since her graduation and has participated in many of the cases described below. **Reported Cases.** Williams v. Chartwell Financial Services, LTD, 204 F.3d 748 (7th Cir. 2000); Hillenbrand v. Meyer Medical Group, 682 N.E.2d 101 (Ill.1st Dist. 1997), 720 N.E.2d 287 (Ill.1st Dist. 1999); Bessette v. Avco Fin. Servs., 230 F.3d 439 (1st Cir. 2000); Large v. Conseco Fin. Servicing Co., 292 F.3d 49 (1st Cir. 2002);; Carbajal v. Capital One, 219 F.R.D. 437 (N.D.Ill. 2004); Russo v. B&B Catering, 209 F.Supp.2d 857 (N.D.IL 2002); Garcia v. Village of Bensenville, 2002 U.S.Dist. LEXIS 3803 (N.D.Ill.); Romaker v. Crossland Mtg. Co., 1996 U.S.Dist. LEXIS 6490 (N.D.IL); Mount v. LaSalle Bank Lake View, 926 F.Supp. 759 (N.D.Ill 1996). She is a member of the Northern District of Illinois trial bar.

6.     **Michelle R. Teggelaar** is a graduate of the University of Illinois (B.A., 1993) and Chicago-Kent College of Law, Illinois Institute of Technology (J.D., with honors, 1997). **Reported Cases:** Johnson v. Revenue Management, Inc., 169 F.3d 1057 (7th Cir.1999); Hernandez v. Attention, LLC, 429 F. Supp. 2d 912 (N.D. Ill. 2005); Coelho v. Park Ridge Oldsmobile, Inc., 247 F. Supp. 2d 1004 (N.D. Ill. 2003); Dominguez v. Alliance Mtge., Co., 226 F. Supp. 2d 907 (N.D. Ill. 2002); Watson v. CBSK Financial Group, Inc., 197 F. Supp. 2d 1118 (N.D. Ill. 2002); Van Jackson v. Check 'N Go of Illinois, Inc. 123 F. Supp. 2d 1085 (N.D. Ill. 2000), Van Jackson v. Check 'N Go of Illinois, Inc., 123 F. Supp. 2d 1079, Van Jackson v. Check 'N Go of Illinois, Inc., 114 F. Supp. 2d 731 (N.D. Ill. 2000); Van Jackson v. Check 'N Go of Illinois, Inc., 193 F.R.D. 544 (N.D. Ill. 2000); Vines v. Sands, 188 F.R.D. 302 (N.D. Ill. 1999); Veillard v. Mednick, 24 F. Supp. 2d 863 (N.D. Ill.1998); Sledge v. Sands, 182 F.R.D. 255 (N.D. Ill. 1998), Vines v. Sands, 188 F.R.D. 203 (N.D. Ill. 1999), Livingston v. Fast Cash USA, Inc., 753 N.E.2d 572 (Ind. 2001); Binder v. Atlantic Credit and Finance, Inc., 2007 U.S. Dist. LEXIS 11483 (S.D. Ind. 2007); Carroll v. Butterfield Heath Care, Inc., 2003 WL 22462604 (N.D. Ill. 2003); Payton v. New Century Mtge., Inc., 2003 WL 22349118 (N.D. Ill. 2003); Seidat v. Allied Interstate, Inc., 2003 WL 2146825 (N.D. Ill. 2003) (Report and Recommendation); Michalowski v. Flagstar Bank, FSB, 2002 WL 112905 (N.D. Ill. 2002); Bigalke v. Creditrust Corp., 2001 WL 1098047 (N.D. Ill 2001) (Report and Recommendation); Donnelly v. Illini Cash Advance, 2000 WL 1161076 (N.D. Ill. 2000); Mitchem v. Paycheck Advance Express, 2000 WL 419992 (N.D. Ill 2000); Pinkett v. Moolah Loan Co., 1999 WL 1080596 (N.D. Ill. 1999); Farley v. Diversified Collection Serv., 1999 WL 965496 (N.D. Ill. 1999); Davis v. Commercial Check Control, 1999 WL 965496 (N.D. Ill. 1999); Sledge v. Sands, 1999 WL 261745 (N.D. Ill. 1999); Slater v. Credit Sciences, Inc., 1998 WL 341631 (N.D. Ill. 1998); Slater v. Credit Sciences, Inc., 1998 WL 299803 (N.D. Ill. 1998).

7.     **Associates**

      **a.**      **Francis R. Greene** is a graduate of Johns Hopkins University (B.A., with honors, May 1984), Rutgers University (Ph.D., October 1991), and Northwestern University Law School (J.D., 2000). **Reported Cases:** <u>Johnson v. Thomas</u>, 342 Ill. App.3d 382, 794 N.E.2d 919 (1st Dist. 2003); <u>Jolly v. Shapiro & Kreisman</u>, 237 F. Supp. 2d 888 (N.D. Ill. 2002); <u>Parker v. 1-800 Bar None, a Financial Corp., Inc.</u> 2002 WL 215530 (N.D. Ill. 2002); <u>Jiang v. Allstate Ins. Co.</u> (199 F.R.D. 267); <u>Hill v. AMOCO Oil Co.</u> 2003 WL 262424, 2001 WL 293628 (N.D. Ill. 2003)**;** <u>Roquet v. Arthur Anderson LLP</u> 2002 WL 1900768 (N.D. Ill. 2002); <u>White v. Financial Credit, Corp.</u> 2001 WL 1665386 (N.D. Ill.); <u>Ransom v. Gurnee Volkswagen</u> 2001 WL 1241297 (N.D. Ill. 2001) and 2002 WL 449703 (N.D. Ill 2002); <u>Doxie v. Impac Funding Corp.</u> 2002 WL 31045387 (N.D. Ill. 2002); <u>Levin v. Kluever & Platt LLC</u> 2003 WL 22757763 and 2003 WL 22757764 (N.D. Ill. 2003); <u>Pleasant v. Risk Management Alternatives</u> 2003 WL 22175390 (N.D. Ill. 2003); <u>Jenkins v. Mercantile Mortgage</u> 231 F. Supp. 2d 737 (N.D. Ill. 2002); <u>Hobson v. Lincoln Ins. Agency, Inc.</u> 2001 WL 55528, 2001 WL 648958 (N.D. Ill. 2001), <u>Anderson v. Lincoln Ins. Agency</u> 2003 WL 291928, <u>Hobson v. Lincoln Ins. Agency</u> 2003 WL 338161 (N.D. Ill. 2003);  <u>Handy v. Anchor Mortgage Corp.</u>, 464 F.3d 760 (7th Cir. 2006).  He is a member of the Northern District of Illinois trial bar.

      **b.**      **Julie Clark** (neé Cobolovic) is a graduate of Northern Illinois University (B.A., 1997) and DePaul University College of Law (J.D., 2000). **Reported Cases:** <u>Qualkenbush v. Harris Trust & Savings Bank</u> 219 F. Supp.2d 935 (N.D. Ill.,2002); <u>Covington-McIntosh v. Mount Glenwood Memory Gardens</u> 2002 WL 31369747 (N.D.I ll.,2002), 2003 WL 22359626 (N.D. Ill. 2003); <u>Ballard Nursing Center, Inc.  v. GF Healthcare Products, Inc.</u>, 2007 U.S. Dist. LEXIS 84425 (N.D. Ill. Nov. 14, 2007); <u>Record-A-Hit, Inc. v. Nat'l. Fire Ins. Co.</u>, No. 1-07-0684, 2007 Ill. App. LEXIS 1194 (Ill. App. 1st Dist. Nov. 13, 2007).

      **c.**      **Heather A. Kolbus** (neé Piccirilli) is a graduate of DePaul University (B.S. *cum  laude,* 1997), and Roger Williams University School of Law (J.D., 2002). **Reported Cases:** <u>Clark v. Experian Info. Solutions, Inc.</u>, 2004 U.S. Dist. LEXIS 28324 (D.S.C. Jan. 14, 2004); <u>DeFrancesco v. First Horizon Home Loan Corp.</u>, 2006 U.S. Dist. LEXIS 80718 (S.D. Ill. Nov. 2, 2006); <u>Jeppesen v. New Century Mortgage Corp.</u>, 2006 U.S. Dist. LEXIS 84035 (N.D. Ind. Nov. 17, 2006); <u>Benedia v. Super Fair Cellular, Inc.</u>, 2007 U.S. Dist. LEXIS 71911 (N.D. Ill. Sept. 26, 2007).

      **d.**      **Thomas E. Soule** is a graduate of Stanford University (B.A., 2000), and the University of Wisconsin Law School (J.D., 2003). **Reported Cases:**  <u>Murray v. Sunrise Chevrolet, Inc.</u>, 441 F.Supp.2d 940 (N.D. Ill. 2006); <u>Iosello v. Leiblys, Inc.</u>, 502 F. Supp.2d 782 (N.D. Ill. 2007); <u>Claffey v. River Oaks Hyundai, Inc.</u>, 486 F. Supp.2d 776 (N.D. Ill. 2007).

      **e.**      **Cassandra P. Miller** is a graduate of the University of Wisconsin – Madison (B.A. 2001) and John Marshall Law School (J.D. *magna cum laude* 2006). **Reported Cases:** <u>Pietras v. Sentry Ins. Co.</u>, 513 F. Supp.2d 983 (N.D. Ill. 2007); <u>Hernandez v. Midland Credit Mgmt.</u>, 2007 U.S. Dist. LEXIS 16054 (N.D. Ill. Sept. 25, 2007); <u>Balogun v. Midland Credit Mgmt.</u>, 2007 U.S. Dist. LEXIS 74845 (S.D. Ind. Oct. 5, 2007).

**f.** **Tiffany N. Hardy** (admitted NY, DC, IL) is a graduate of Tuskegee University (B.A. 1998) and Syracuse University College of Law (J.D.2001).

**g.** **Zachary Jacobs** is a graduate of the University of South Dakota (B.S. 2002) and Chicago-Kent College of Law, Illinois Institute of Technology (J.D. 2007).

**h.** **Rupali Shah** is a graduate of the University of Chicago (B.A. 2004) and University of Illinois College of Law (J.D. 2007).

**i.** **Michael J. Aschenbrener** is a graduate of the University of Minnesota (B.A. 2001) and the Chicago-Kent College of Law, Illinois Institute of Technology (J.D. May 2007).

**8.** The firm also has 15 legal assistants, as well as other support staff.

**9.** Since its inception, the firm has recovered more than $500 million for consumers.

**10.** The types of cases handled by the firm are illustrated by the following:

**11.** **Mortgage charges and servicing practices:** The firm has been involved in dozens of cases, mostly class actions, complaining of illegal charges on mortgages and improper servicing practices. These include MDL-899, In re Mortgage Escrow Deposit Litigation, and MDL-1604, In re Ocwen Federal Bank FSB Mortgage Servicing Litigation, as well as the Fairbanks mortgage servicing litigation. Decisions in the firm's mortgage cases include: <u>Christakos v. Intercounty Title Co.,</u> 196 F.R.D. 496 (N.D.Ill. 2000); <u>Johnstone v. Bank of America, N.A.,</u> 173 F.Supp.2d 809 (N.D.Ill. 2001); <u>Leon v. Washington Mut. Bank, F.A.,</u> 164 F.Supp.2d 1034 (N.D.Ill. 2001); <u>Williamson v. Advanta Mortg. Corp.,</u> 1999 U.S. Dist. LEXIS 16374 (N.D.Ill., Oct. 5, 1999); <u>McDonald v. Washington Mut. Bank, F.A.,</u> 2000 U.S. Dist. LEXIS 11496 (N.D.Ill., June 22, 2000); <u>Metmor Financial, Inc. v. Eighth Judicial District Court,</u> No. 23848 (Nev.Sup.Ct., Apr. 27, 1993); <u>GMAC Mtge. Corp. v. Stapleton,</u> 236 Ill.App.3d 486, 603 N.E.2d 767 (1st Dist. 1992), leave to appeal denied, 248 Ill.2d 641, 610 N.E.2d 1262 (1993); <u>Leff v. Olympic Fed. S. & L. Ass'n,</u> 1986 WL 10636 (N.D.Ill. 1986); <u>Aitken v. Fleet Mtge. Corp.,</u> 1991 U.S.Dist. LEXIS 10420 (N.D.Ill. 1991), and 1992 U.S.Dist. LEXIS 1687 (N.D.Ill., Feb. 12, 1992); <u>Poindexter v. National Mtge. Corp.,</u> 1991 U.S.Dist. LEXIS 19643 (N.D.Ill., Dec. 23, 1991), later opinion, 1995 U.S.Dist. LEXIS 5396 (N.D.Ill., April 24, 1995); <u>Sanders v. Lincoln Service Corp.,</u> 1993 U.S.Dist. LEXIS 4454 (N.D.Ill. 1993); <u>Robinson v. Empire of America Realty Credit Corp.,</u> 1991 U.S.Dist. LEXIS 2084 (N.D.Ill., Feb. 20, 1991); <u>In re Mortgage Escrow Deposit Litigation,</u> M.D.L. 899, 1994 U.S.Dist. LEXIS 12746 (N.D.Ill., Sept. 8, 1994); <u>Greenberg v. Republic Federal S. & L. Ass'n,</u> 1995 U.S.Dist. LEXIS 5866 (N.D.Ill., May 1, 1995).

**12.** The recoveries in the escrow overcharge cases alone are over $250 million. <u>Leff</u> was the seminal case on mortgage escrow overcharges.

13.    The escrow litigation had a substantial effect on industry practices, resulting in limitations on the amounts which mortgage companies held in escrow.

14.    **Bankruptcy:**  The firm brought a number of cases complaining that money was being systematically collected on discharged debts, in some cases through the use of invalid reaffirmation agreements, including the national class actions against Sears and General Electric.  Conley v. Sears, Roebuck, 1:97cv11149 (D.Mass); Fisher  v. Lechmere Inc., 1:97cv3065, (N.D.Ill.).  These cases were settled and resulted in recovery by nationwide classes. Cathleen Combs successfully argued the first Court of Appeals case to hold that a bankruptcy debtor induced to pay a discharged debt by means of an invalid reaffirmation agreement may sue to recover the payment.  Bessette v. Avco Financial Services, 230 F.3d 439 (1st Cir. 2000).

15.    **Automobile sales and financing practices:**  The firm has brought many cases challenging practices relating to automobile sales and financing, including:

a.    Hidden finance charges resulting from pass-on of discounts on auto purchases.  Walker v. Wallace Auto Sales, Inc., 155 F.3d 927, 1998 U.S. App. LEXIS 22663 (7th Cir. 1998).

b.    Misrepresentation of amounts disbursed for extended warranties. Taylor v. Quality Hyundai, Inc., 150 F.3d 689, 1998 U.S.App. LEXIS 16434 (7th Cir. 1998); Grimaldi v. Webb, 282 Ill.App.3d 174, 668 N.E.2d 39 (1st Dist. 1996), leave to appeal denied, 169 Ill.2d 566 (1996); Slawson v. Currie Motors Lincoln Mercury, Inc., 1995 U.S.Dist. LEXIS 451 (N.D.Ill., Jan. 5, 1995); Cirone-Shadow v. Union Nissan, Inc., 1995 U.S.Dist. LEXIS 1379 (N.D.Ill., Feb. 3, 1995), later opinion, 1995 U.S.Dist. LEXIS 5232 (N.D.Ill., April 20, 1995) (same); Chandler v. Southwest Jeep-Eagle, Inc., 1995 U.S. Dist. LEXIS 8212 (N.D.Ill., June 8, 1995); Shields v. Lefta, Inc., 1995 U.S.Dist. LEXIS 7807 (N.D.Ill., June 5, 1995).

c.    Spot delivery.  Janikowski v. Lynch Ford, Inc., 1999 U.S. Dist. LEXIS 3524 (N.D.Ill., March 11, 1999); Diaz v. Westgate Lincoln Mercury, Inc., 1994 U.S.Dist. LEXIS 16300 (N.D.Ill. 1994);  Grimaldi v. Webb, 282 Ill.App.3d 174, 668 N.E.2d 39 (1st Dist. 1996), leave to appeal denied, 169 Ill.2d 566 (1996).

d.    Force placed insurance.  Bermudez v. First of America Bank Champion, N.A., 860 F.Supp. 580 (N.D.Ill. 1994); Travis v. Boulevard Bank, 1994 U.S.Dist. LEXIS 14615 (N.D.Ill., Oct. 13, 1994), modified, 880 F.Supp. 1226 (N.D.Ill., 1995); Moore v. Fidelity Financial Services, Inc., 884 F. Supp. 288 (N.D.Ill. 1995).

e.    Improper obligation of cosigners.  Lee v. Nationwide Cassell, 174 Ill.2d 540, 675 N.E.2d 599 (1996); Taylor v. Trans Acceptance Corp., 267 Ill.App.3d 562, 641 N.E.2d 907 (1st Dist. 1994), leave to appeal denied, 159 Ill.2d 581, 647 N.E.2d 1017 (1995).

f.    Evasion of FTC holder rule.  Brown v. LaSalle Northwest Nat'l Bank, 148 F.R.D. 584 (N.D.Ill. 1993), 820 F.Supp. 1078 (N.D.Ill. 1993), and 1993 U.S.Dist.

LEXIS 11419 (N.D.Ill., Aug. 13, 1993).

   **16.**  These cases also had a substantial effect on industry practices. The warranty cases, such as <u>Grimaldi</u>, <u>Gibson</u>, <u>Slawson</u>, <u>Cirone-Shadow</u>, <u>Chandler</u>, and <u>Shields</u>, resulted in the Federal Reserve Board's revision of applicable disclosure requirements, so as to prevent car dealers from representing that the charge for an extended warranty was being disbursed to a third party when that was not in fact the case.

   **17.**  **Predatory lending practices:** The firm has brought numerous cases challenging predatory mortgage and "payday" lending practices, mostly as class actions. <u>Livingston v. Fast Cash USA, Inc.</u>, 753 N.E.2d 572 (Ind. Sup. Ct. 2001); <u>Williams v. Chartwell Fin. Servs.</u>, 204 F.3d 748 (7th Cir. 2000); <u>Parker v. 1-800 Bar None, a Financial Corp., Inc.</u>, 01 C 4488, 2002 WL 215530 (N.D.Ill., Feb 12, 2002); <u>Gilkey v. Central Clearing Co.</u>, 202 F.R.D. 515 (E.D.Mich. 2001); <u>Van Jackson v. Check 'N Go of Ill., Inc.</u>, 114 F.Supp.2d 731 (N.D.Ill. 2000), later opinion, 193 F.R.D. 544 (N.D.Ill. 2000), 123 F.Supp. 2d 1079 (N.D.Ill. 2000), later opinion, 123 F.Supp. 2d 1085 (N.D.Ill. 2000); <u>Henry v. Cash Today, Inc.</u>, 199 F.R.D. 566 (S.D.Tex. 2000); <u>Donnelly v. Illini Cash Advance, Inc.</u>, 00 C 94, 2000 WL 1161076, 2000 U.S. Dist. LEXIS 11906 (N.D.Ill., Aug. 14, 2000); <u>Jones v. Kunin</u>, 2000 U.S. Dist. LEXIS 6380 (S.D.Ill., May 1, 2000); <u>Davis v. Cash for Payday</u>, 193 F.R.D. 518 (N.D.Ill. 2000); <u>Reese v. Hammer Fin. Corp.</u>, 99 C 716, 1999 U.S. Dist. LEXIS 18812, 1999 WL 1101677 (N.D.Ill., Nov. 29, 1999); <u>Pinkett v. Moolah Loan Co.</u>, 1999 U.S. Dist. LEXIS 17276 (N.D.Ill., Nov. 1, 1999); <u>Gutierrez v. Devon Fin. Servs.</u>, 1999 U.S. Dist. LEXIS 18696 (N.D.Ill., Oct. 6, 1999); <u>Vance v. National Benefit Ass'n</u>, 99 C 2627, 1999 WL 731764, 1999 U.S. Dist. LEXIS 13846 (N.D.Ill., Aug. 26, 1999).

   **18.**  **Other consumer credit issues:** The firm has also brought a number of other Truth in Lending and consumer credit cases, mostly as class actions, involving such issues as:

     **a.**  Phony nonfiling insurance. <u>Edwards v. Your Credit Inc.</u>, 148 F.3d 427, 1998 U.S. App. LEXIS 16818 (5th Cir. 1998); <u>Adams v. Plaza Finance Co.</u>, 1999 U.S. App. LEXIS 1052 (7th Cir., January 27, 1999); <u>Johnson v. Aronson Furniture Co.</u>, 1997 U.S. Dist. LEXIS 3979 (N.D. Ill., March 31, 1997).

     **b.**  The McCarran Ferguson Act exemption. <u>Autry v. Northwest Premium Services, Inc.</u>, 144 F.3d 1037, 1998 U.S. App. LEXIS 9564 (7th Cir. 1998).

     **c.**  Loan flipping. <u>Emery v. American General</u>, 71 F.3d 1343 (7th Cir. 1995). <u>Emery</u> limited the pernicious practice of "loan flipping," in which consumers are solicited for new loans and are then refinanced, with "short" credits for unearned finance charges and insurance premiums being given through use of the "Rule of 78s."

     **d.**  Home improvement financing practices. <u>Fidelity Financial Services, Inc. v. Hicks</u>, 214 Ill.App.3d 398, 574 N.E.2d 15 (1st Dist. 1991), leave to appeal

denied, 141 Ill.2d 539, 580 N.E.2d 112; Heastie v. Community Bank of Greater Peoria, 690 F.Supp. 716 (N.D.Ill. 1989), later opinion, 125 F.R.D. 669 (N.D.Ill. 1990), later opinions, 727 F.Supp. 1133 (N.D.Ill. 1990), and 727 F.Supp. 1140 (N.D.Ill. 1990). Heastie granted certification of a class of over 6,000 in a home improvement fraud case.

       **e.**      Arbitration clauses. Wrightson v. ITT Financial Services, 617 So.2d 334 (Fla. 1st DCA 1993).

       **f.**      Insurance packing. Elliott v. ITT Corp., 764 F.Supp. 102 (N.D.Ill. 1990), later opinion, 150 B.R. 36 (N.D.Ill. 1992).

       **19.**     **Automobile leases:** The firm has brought a number of a cases alleging illegal charges and improper disclosures on automobile leases, mainly as class actions. Decisions in these cases include Lundquist v. Security Pacific Automotive Financial Services Corp., Civ. No. 5:91-754 (TGFD) (D.Conn.), aff'd, 993 F.2d 11 (2d Cir. 1993); Kedziora v. Citicorp Nat'l Services, Inc., 780 F.Supp. 516 (N.D.Ill. 1991), later opinion, 844 F.Supp. 1289 (N.D.Ill. 1994), later opinion, 883 F.Supp. 1144 (N.D.Ill. 1995), later opinion, 1995 U.S.Dist. LEXIS 12137 (N.D.Ill., Aug. 18, 1995), later opinion, 1995 U.S.Dist. LEXIS 14054 (N.D.Ill., Sept. 25, 1995); Johnson v. Steven Sims Subaru and Subaru Leasing, 1993 U.S.Dist. LEXIS 8078 (N.D.Ill., June 9, 1993), and 1993 U.S.Dist. LEXIS 11694 (N.D.Ill., August 20, 1993); McCarthy v. PNC Credit Corp., 1992 U.S.Dist. LEXIS 21719 (D.Conn., May 27, 1992); Kinsella v. Midland Credit Mgmt., Inc., 1992 U.S.Dist. LEXIS 1405, 1992 WL 26908 (N.D.Ill. 1992); Highsmith v. Chrysler Credit Corp., 18 F.3d 434 (7th Cir. 1994); Black v. Mitsubishi Motors Credit of America, Inc., 1994 U.S.Dist. LEXIS 11158 (N.D.Ill., August 10, 1994); Simon v. World Omni Leasing Inc., 146 F.R.D. 197 (S.D.Ala. 1992). Settlements in such cases include Shepherd v. Volvo Finance North America, Inc., 1-93-CV-971 (N.D.Ga.)($8 million benefit); McCarthy v. PNC Credit Corp., 291 CV 00854 PCD (D.Conn.); Lynch Leasing Co. v. Moore, 90 CH 876 (Circuit Court of Cook County, Illinois) (class in auto lease case was certified for litigation purposes, partial summary judgment was entered, and case was then settled); Blank v. Nissan Motor Acceptance Corp., 91 L 8516 (Circuit Court of Cook County, Illinois); Mortimer v. Toyota Motor Credit Co., 91 L 18043 (Circuit Court of Cook County, Illinois); Duffy v. Security Pacific Automotive Financial Services, Inc., 93-729 IEG (BTM) (S.D.Cal., April 28, 1994).

       **20.**    Lundquist and Highsmith are leading cases; both held that commonly-used lease forms violated the Consumer Leasing Act. As a result of the Lundquist case, the Federal Reserve Board completely revamped the disclosure requirements applicable to auto leases, resulting in vastly improved disclosures to consumers.

       **21.**     **Collection practices:** The firm has brought a number of cases under the Fair Debt Collection Practices Act, both class and individual. Decisions in these cases include: Jenkins v. Heintz, 25 F.3d 536 (7th Cir. 1994), aff'd 115 S.Ct. 1489, 131 L.Ed.2d 395 (1995); Johnson v. Revenue Management Corp., 169 F.3d 1057, 1999 U.S. App. LEXIS 3142 (7th Cir. 1999); Keele v. Wexler & Wexler, 1996 U.S.Dist. LEXIS 3253 (N.D.Ill., March 18, 1996)

(class), 1995 U.S.Dist. LEXIS 13215 (N.D.Ill. 1995) (merits), aff'd, 149 F.3d 589, 1998 U.S.App. LEXIS 15029 (7th Cir. 1998); Mace v. Van Ru Credit Corp., 109 F.3d 338, 1997 U.S.App. LEXIS 5000 (7th Cir., Mar. 17, 1997); Maguire v. Citicorp Retail Services, Inc., 147 F.3d 232, 1998 U.S.App. LEXIS 16112 (2d Cir. 1998); Young v. Citicorp Retail Services, Inc., 1998 U.S.App. LEXIS 20268 (2d Cir. 1998); Charles v. Lundgren & Assocs., P.C., 119 F.3d 739, 1997 U.S. App. LEXIS 16786 (9th Cir. 1997); Avila v. Rubin, 84 F.3d 222 (7th Cir. 1996), aff'g Avila v. Van Ru Credit Corp., 1995 U.S.Dist. LEXIS 461 (N.D.Ill., Jan. 10, 1995), later opinion, 1995 U.S.Dist. LEXIS 1502 (N.D.Ill., Feb. 6, 1995), later opinion, 1995 U.S.Dist. LEXIS 17117 (N.D.Ill., Nov. 14, 1995);  Tolentino v. Friedman, 833 F.Supp. 697 (N.D.Ill. 1993), aff'd in part and rev'd in part, 46 F.3d 645 (7th Cir. 1995); Blakemore v. Pekay, 895 F.Supp.972 (N.D.Ill. 1995); Oglesby v. Rotche, 1993 U.S.Dist. LEXIS 15687 (N.D.Ill., Nov. 4, 1993), later opinion, 1994 U.S.Dist. LEXIS 4866 (N.D.Ill., April 15, 1994); Laws v. Cheslock, 1999 U.S.Dist. LEXIS 3416 (N.D.Ill., Mar. 8, 1999);Davis v. Commercial Check Control, Inc., 1999 U.S. Dist. LEXIS 1682 (N.D.Ill., Feb. 12, 1999); Hoffman v. Partners in Collections, Inc., 1993 U.S.Dist. LEXIS 12702 (N.D.Ill., Sept. 15, 1993); Vaughn v. CSC Credit Services, Inc., 1994 U.S.Dist. LEXIS 2172 (N.D.Ill., March 1, 1994), adopted, 1995 U.S.Dist. LEXIS 1358 (N.D.Ill., Feb. 3, 1995); Beasley v. Blatt, 1994 U.S.Dist. LEXIS 9383 (N.D.Ill., July 14, 1994); Taylor v. Fink, 1994 U.S.Dist. LEXIS 16821 (N.D.Ill., Nov. 23, 1994); Gordon v. Fink, 1995 U.S.Dist. LEXIS 1509 (N.D.Ill., Feb. 7, 1995); Brujis v. Shaw, 876 F.Supp. 198 (N.D.Ill. 1995). Settlements in such cases include Boddie v. Meyer, 93 C 2975 (N.D.Ill.); and Cramer v. First of America Bank Corporation, 93 C 3189 (N.D.Ill.).

     **22.**    Jenkins v. Heintz is a leading decision regarding the liability of attorneys under the Fair Debt Collection Practices Act.  I argued it before the Supreme Court and Seventh Circuit.  Avila v. Rubin is a leading decision on phony "attorney letters."

     **23.**    **Fair Credit Reporting Act:** The firm has filed numerous cases under the Fair Credit Reporting Act, primarily as class actions.  One line of cases alleges that lenders and automotive dealers, among others, improperly accessed consumers' credit information, without their consent and without having a purpose for doing so permitted by the FCRA.   Important decisions in this area include: Cole v. U.S. Capital, Inc., 389 F.3d 719 (7th Cir. 2004), Murray v. GMAC Mortgage Corp., 434 F.3d 948 (7th Cir. 2006); Perry v. First National Bank, 459 F.3d 816 (7th Cir. 2006); Murray v. Sunrise Chevrolet, Inc., 441 F. Supp.2d 940 (N.D. Ill. 2006);Shellman v. Countrywide Home Loans, Inc., 1:05-CV-234-TS, 2007 U.S. Dist. LEXIS 27491 (N.D.Ind.,  April 12, 2007); In re Ocean Bank, 06  C 3515, 2007 U.S. Dist. LEXIS 28973 (N.D.Ill., March 16, 2007), later opinion,  2007 U.S. Dist. LEXIS 29443 (N.D. Ill., Apr. 9, 2007); Asbury v. People's Choice Home Loan, Inc., 05 C 5483, 2007 U.S. Dist. LEXIS 17654 (N.D.Ill., March 12, 2007); Claffey v. River Oaks Hyundai, Inc., 238 F.R.D. 464 (N.D.Ill. 2006); Murray v. IndyMac Bank, FSB, 461 F.Supp.2d 645 (N.D.Ill. 2006); Kudlicki v. Capital One Auto Finance, Inc., 2006 U.S. Dist. LEXIS 81103 (N.D. Ill., Nov. 2, 2006); Thomas v. Capital One Auto Finance, Inc., 2006 U.S. Dist. LEXIS 81358 (N.D. Ill., Oct. 24, 2006); Pavone v. Aegis Lending Corp., 2006 U.S. Dist. LEXIS 62157 (N.D. Ill., Aug. 31, 2006); Murray v. E*Trade Financial Corp., 2006 U.S. Dist. LEXIS 53945 (N.D. Ill., July 19, 2006); Bonner v. Home 123 Corp., 2006 U.S. Dist. LEXIS 37922 (N.D. Ind., May 25, 2006); Murray v. Sunrise

Chevrolet , Inc., 2006 U.S. Dist. LEXIS 19626 (N.D. Ill., Mar. 30, 2006); and Murray v. Finance America, LLC, 2006 U.S. Dist. LEXIS 7349 (N.D. Ill., Jan 5, 2006).  More than 15 such cases have been settled on a classwide basis.

**24.    Class action procedure:**  Important decisions include Crawford v. Equifax Payment Services, Inc., 201 F.3d 877 (7th Cir. 2000); Blair v. Equifax Check Services, Inc., 181 F.3d 832 (7th Cir. 1999); Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (7th Cir. 1997); and Gordon v. Boden, 224 Ill.App.3d 195, 586 N.E.2d 461 (1st Dist. 1991).

**25.    Landlord-tenant:** The firm has brought a number of class actions against landlords for various matters including failing to pay interest on security deposits or commingling security deposits, breach of the warranty of habitability, improper late charges, and various violations of the CRLTO. Reported decisions include: Wang v. Williams,343 Ill. App. 3d 495; 797 N.E.2d 179 (5th Dist. 2003); Onni v. Apartment Management and Investment Co., 344 Ill. App. 3d 1099; 801 N.E.2d 586 (2d Dist. 2003) (case challenging improper late charges, which later settled on a class basis for $200,000); Dickson v. West Koke Mill Village P'Ship, 329 Ill.App.3d 341 (4th Dist. 2002).  Illustrative cases include: Hale v. East Lake Management & Developmental Corp., et al., 00 CH 16139, in the Cook County Circuit Court, Judge Madden granted class certification for tenants who had not been paid their security deposit interest after the end of each twelve month rental period.  The East Lake case later settled on a classwide basis for over $400,000.

**26.**    Some of the other reported decisions in our cases include:  Elder v. Coronet Ins. Co., 201 Ill.App.3d 733, 558 N.E.2d 1312 (1st Dist. 1990); Smith v. Keycorp Mtge., Inc., 151 Bankr. 870 (N.D.Ill. 1992); Gordon v. Boden, 224 Ill.App.3d 195, 586 N.E.2d 461 (1st Dist. 1991), leave to appeal denied, 144 Ill.2d 633, 591 N.E.2d 21, cert. denied, U.S. (1992); Armstrong v. Edelson, 718 F.Supp. 1372 (N.D.Ill. 1989); Newman v. 1st 1440 Investment, Inc., 1993 U.S.Dist. LEXIS 354 (N.D.Ill. 1993); Mountain States Tel. & Tel. Co. v. District Court, 778 P.2d 667 (Colo. 1989); Disher v. Fulgoni, 124 Ill.App.3d 257, 464 N.E.2d 639, 643 (1st Dist. 1984); Harman v. Lyphomed, Inc., 122 F.R.D. 522 (N.D.Ill. 1988); Haslam v. Lefta, Inc., 1992 U.S.Dist. LEXIS 3623 (N.D.Ill., March 25, 1994); Source One Mortgage Services Corp. v. Jones, 1994 U.S.Dist. LEXIS 333 (N.D.Ill., Jan. 13, 1994).

**27.**    Gordon v. Boden is the first decision approving "fluid recovery" in an Illinois class action.  Elder v. Coronet Insurance held that an insurance company's reliance on lie detectors to process claims was an unfair and deceptive trade practice.

s/ Daniel A. Edelman<br>
Daniel A. Edelman

EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, Suite 1800
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)